Exhibit A

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIS INTERNET SERVICES, | Case No. C-05-05124 JCS |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING ACTION [Docket Nos. 318, 320]** |
| v. | |
| OPTIN GLOBAL, INC., ET AL., | |
| Defendants. | ~~(FILED UNDER SEAL)~~ |
| _____/ | REDACTED - PUBLIC VERSION |

## I.    INTRODUCTION

Plaintiff, ASIS Internet Services ("ASIS"), filed this action on December 12, 2005, asserting that various Defendants, including AzoogleAds.com ("Azoogle"), violated the CAN-SPAM Act of 2003, 15 U.S.C. §§ 7701 *et seq.*, and California Business and Professions Code § 17529.5. Azoogle and ASIS now bring motions for summary judgment (hereinafter "Plaintiff's Motion" and "Defendant's Motion"). The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). A hearing on the Motions was held on Friday, March 21, 2008, at 1:30 p.m. For the reasons stated below, Plaintiff's Motion is DENIED. Defendant's Motion is GRANTED.[1]

_____

[1] The Court declines to rule on Azoogle's objections to Plaintiff's evidence [Docket No. 374] because the objections have no bearing on the Court's holding; even assuming that all of Plaintiff's evidence is admissible, the result is the same as to the issues on which the Court's ruling depends.

United States District Court
For the Northern District of California

1    **II.    BACKGROUND**

2        **A.    Facts[2]**

3            **1.    The Parties**

4        Plaintiff ASIS is a California corporation and an Internet Access Service Provider. Second

5    Amended Complaint ("SAC") at 2; *see also* Joint Statement of Stipulated Facts in Support of Motion

6    for Summary Judgment ("Joint Statement"), No. 1 (stipulation that ASIS is a provider of Internet

7    Access Service with the meaning of 15 U.S.C. § 7706(g)(1), 15 U.S.C. § 7702(11) and 47 U.S.C.

8    § 231(e)(4)), No. 2 (stipulation that ASIS is an Electronic Mail Service Provider within the

9    definition of California Business and Professions Code §§ 17529.5 and 17529.1(h)). According to

10    ASIS President and CEO Nella White, ASIS was created in 1995 and in 2005 had just under 1,000

11    Internet access and e-mail customers. Declaration of Nella White in Support of Plaintiff's Motion

12    for Summary Adjudication of Issues ("White Motion Decl."), ¶¶ 2-3.

13        Azoogle is an Internet marketing company through which "lead vendors" and providers

14    channel leads to sellers of goods and services. Declaration of David Graff in Support of

15    AzoogleAds.com, Inc.'s Motion for Summary Judgment or in the Alternative Summary

16    Adjudication ("Graff Motion Decl."), ¶ 2.

17            **2.    How Azoogle Obtained and Transmitted Leads**

18        Azoogle's CEO, Donald Mathis, explains how Azoogle obtained and transmitted leads in

19    2005, during the relevant period for this case, as follows:

20            Since 2003, Azoogle has acquired marketing leads by way of two
             categories of third party lead providers: affiliates and third party
21            vendors. Azoogle has always relied primarily on registered affiliates
             to generate leads, which Azoogle then sells to the ultimate purchaser.
22            Azoogle no longer uses third-party vendors as lead providers.

23            Prior to generating any leads for Azoogle, prospective affiliates must
             register with, and be accepted after a vetting process by, Azoogle to
24            become an affiliate. A prospective affiliate must agree to Azoogle's
             Affiliate Terms and Conditions, which among other things, expressly
25            prohibits the affiliate from violating CAN-SPAM or any other law.

26    _____

27        [2] Although each party submitted literally hundreds of facts that are alleged to be undisputed, the
      parties were able to agree on only *nine* facts in their Joint Statement of Undisputed Facts. The Court,
28    therefore, has been left to determine, based on the evidence and arguments by the parties, which facts
      are undisputed and which are not.

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

An Azoogle affiliate generates leads for Azoogle by first logging into the AzoogleAds 2.0 (previously AzoogleAds 1.0) software system and selecting from a list of Azoogle's branded offers to serve as the basis for its lead generation. During October 2005, Azoogle had a few such properties in its mortgage lead business, which included its branded offers: Low Rate Advisors and Christian Mortgages USA. Azoogle maintained creative material for each of these branded offers, which an affiliate could download, if contractually permitted, from Azoogle's protected computers, through the AzoogleAds software system. Once an affiliate downloaded Azoogle's creative material, that affiliate could use the creative material as specified in the terms of its contract with Azoogle. The contract might permit the affiliate to use the creative material in emails, website banners, or other specified media, though only in connection with the related Azoogle branded offer. When an affiliate placed the downloaded creative material in an email or banner ad, users would click on a link in the email or banner add and be redirected to the Azoogle website for that respective branded offer, such as LowRateAdvisors.com.



Even with its broad affiliate network, Azoogle has at times been unable to satisfy the demands of its lead purchasers by affiliate lead generation alone. In such situations, Azoogle has used third party vendors to provide qualified mortgage leads to Azoogle, in order to satisfy the remainder of the demand. Because vendors represented that they had their own internal compliance procedures, Azoogle did not vet them in the same manner that it vetted its own affiliates.

. . .

Unlike affiliates, a third-party vendor would enter into a contract with Azoogle, known as an Insertion Order, whereby the vendor agreed to sell Azoogle certain qualified mortgage leads subject to express contractual criteria. These leads were *not* generated by sending consumers to web pages owned and operated by Azoogle. Rather, the leads were generated solely through the methods and creative materials owned by the vendor, though the Insertion Order expressly limited the acceptable methods the vendors could use to generate the leads.

3

United States District Court

For the Northern District of California

1    Declaration of Donald H. Mathis in Opposition to Plaintiff ASIS Internet Services, Inc.'s Motion for

2    Summary Adjudication of Issues ("Mathis Opposition Decl."), ¶¶ 7-14. According to Azoogle, it

3    has never sent unsolicited emails to generate leads for its clients. *Id.*

4         Regarding the use of Azoogle's creative materials by vendors, Azoogle's Director of Media

5    Buying, Julian Mossanen, testified in his deposition that

6

7         Supplemental Declaration of Henry M. Burgoyne, III in Support of AzzogleAds.com,

8    Inc.'s Reply Memorandum for Summary Judgment or in the Alternative Summary Adjudication

9    ("Burgoyne Supp. Decl."), Ex. C (Mossanen Depo) at 97-98.

10

11         *Id.* at 98.

12    Mossanen also testified in his deposition regarding the process of finding third party vendors.

13

14         Singleton Opposition Decl., Ex. J (Mossanen

15    Depo.) at 22.

16

17

18    *Id.* at 23-24.

19

20         *Id.* at 33.

21         *Id.* at 24.

22

23    *Id.* at 24.

24         *Id.* at 36.

25         *Id.*

26         *Id.*

27    *Id.* at 37.

28    *Id.* at 51.

██████████████████████████████████████████████

██████████████████████████████ *Id.* at 129.

██████████████████████████████████████████████

██████████████████████ Singleton Opposition Decl., Ex. M

(Zhardanovsky Depo.) at 21. However, Marvin Hernandez, who handled spam complaints at

Azoogle, testified in his deposition that there were a handful of Azoogle affiliatees who had received

more than ten spam complaints. Singleton Opposition Decl., Ex. K (Hernandez Depo.) at 67-68.

### 3.    Azoogle and Spam Compliance

Azoogle was founded in 2001 as an email Application Service Provider ("ASP"), which

worked with bulk email providers on behalf of sellers of goods and services. Mathis Opposition

Decl., ¶ 6. According to CEO Mathis, Azoogle gave up its ASP line of business in 2003 when it

began receiving complaints about its email partners. *Id.* However, in September 2004, Azoogle was

suspended by ISP Savvis because an email marketing watchdog, SpamCop, had complained about

Azoogle's work with bulk emailers. *Id.*; *see also* Declaration of Margarita Calpotura in Opposition

to Plaintiff ASIS Internet Services, Inc.'s Motion for Summary Adjudication of Issues ("Calpotura

Opposition Decl."), Ex. B at 853 (letter from Savvis to Azoogle dated September 10, 2004, notifying

Azoogle that Savvis was suspending its services due to excessive spam complaints).

In February 2005, Azoogle learned that it was listed on the ROKSO website maintained by

Spamhaus Project. Mathis Opposition Decl., ¶ 6. Spamhaus describes itself as "an international

non-profit organization whose mission is to track the Internet Spam Gangs . . . ." Calpotura

Opposition Decl., Ex. G (Spamhaus Project web page). Spamhaus publishes the Register of Known

Spam Operations, known by its acronym, "ROKSO." *Id.* Starting in February 2005, Azoogle

worked with Spamhaus to improve its compliance with Spamhaus's anti-spam guidelines and in

early 2006, Azoogle was removed from ROKSO. Mathis Opposition Decl., ¶ 6; Calpotura

Opposition Decl., Ex. B (email correspondence between Azoogle and Spamhaus).

### 4.    "Knock-Off" Websites

In an email dated February 9, 2005, Azoogle asked Spamhaus for advice about spammers

who were copying Azoogle images:

United States District Court
For the Northern District of California

5



Calpotura Opposition Decl., Ex. B at AZ 49-50.

One such knock-off website was LowRateAdvisors.net. Mathis Decl., ¶ 26. The creator of this website, Scott Tesler, described his activities with respect to LowRateAdvisors.net as follows:

> I have registered a domain, "lowrateadvisors.net." For some time this site redirected to Azoogle's web pages, and I drove traffic to Azoogle in this manner, and did so as an Azoogle affiliate.
>
> At one point . . . I copied Azoogle's web page, "lowrateadvisors.com" and published it on the web as "lowrateadvisors.net." . . . I may have generated leads using this page but I cannot recall.

Declaration of Henry M. Burgoyne, III in Support of AzoogleAds.com, Inc.'s Motion for Summary Judgment or on the Alternative Summary Adjudication ("Burgoyne Motion Decl."), Ex. K (Tesler Decl.). According to Azoogle's CEO, Donald Mathis, he became aware of the LowRateAdvisors.net website, for the first time, at his deposition in this action. Mathis Opposition Decl., ¶ 26. Mathis further states that Azoogle neither permitted or approved the creation of LowRateAdvisors.net. *Id.* Soon after Mathis's deposition, Azoogle sent a cease-and-desist order to Tesler. *Id.*, ¶ 27.

According to Azzogle, another "knock-off" web site copied from the lowrateadvisors.com web site was greatratecentral.com. Mathis Motion Decl., ¶ 28. That web site was the subject of an action by the Federal Trade Commission in 2005 against Optin Global, Inc. and three other former defendants in this action ("the FTC" Action"). Calpotura Decl., ¶9. Azoogle was not named as a defendant in that action. *Id.*

### 5.    ASIS's Anti-Spam Efforts

Regarding the burden that spam has imposed on ASIS, Nella White states as follows:

> ASIS Internet has received an ever-increasing amount of SPAM for the past several years. The cost of processing email and filtering out

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1
2
3

> SPAM has grown dramatically. ASIS has had to add software,
> hardware, staff, and network bandwith to fight the SPAM. ASIS also
> currently uses a service, POSTINI, to preprocess all of the mail sent to
> its email server, at considerable expense.

White Opposition Decl., ¶ 2.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

In her deposition, White estimated that ASIS spends $3,000.00/month on spam filtering and employee time devoted to dealing with spam issues. Declaration of Jason Singleton in Support of Opposition to Azoogle's Motion for Summary Judgment ("Singleton Opposition Dec."), Ex. A (White Depo.) at 223. She also testified that a third of ASIS employee time is spent dealing with spam complaints. Calpotura Opposition Decl., Ex. K (White Depo.) at 90-91, 98-99. However, she explained that the "bulk" of that time is spent dealing "indirectly" with spam complaints, namely, helping people who don't have proper email configurations. *Id.* Later in her deposition, she admitted that she had never been able to get her staff to provide breakdowns of how they spent their time and could not say how much time they spent dealing with spam. Calpotura Opposition Decl., Ex. K (White Depo.) at 99-100. White also testified that ASIS added only one employee during the relevant period, who was not hired to address spam problems but rather, was primarily involved in installing wireless broadband services. *Id.* Supplemental Declaration of Henry M. Burgoyne, III in Opposition to Plaintiff ASIS Internet Services, Inc.'s Motion for Summary Adjudication of Issues ("Burgoyne Supp. Decl."), Ex. A (White Depo.) at 89.

19
20
21
22
23
24
25
26
27

ASIS began using its current spam filtering service, Postini, in 2001. Burgoyne Motion Decl., Ex. S. Postini charges ASIS based on the number of customers who use the service rather than the volume of spam that it filters. Burgoyne Motion Decl., Ex. C (White Depo.) at 219, Ex. S (Postini Contract). Based on Postini invoices, the cost of Postini's services to Azoogle in 2005 was as follows: $465.90 (January 2005); $471.00 (February 2005); $474.00 (March 2005); $462.60 (April 2005); $467.40 (May 2005); $471.00 (June 2005); $474.60 (July 2005); $360.00 (August 2005); $453.00 (September 2005); $457.50 (October 2005); $439.80 (November 2005); $439.80 (December 2005). ASIS's system administrator is Falcon Knight, which has leased two servers to ASIS since 2004 or 2005. Burgoyne Decl., Ex. J (Deposition of Shawn O'Connor) at 18, 55.

28

### 6. The Bruce Wolf Lead

7

United States District Court
For the Northern District of California

1    Plaintiff's claims arise from a "lead" that ASIS asserts shows that Azoogle was responsible

2    for the initiation of over 12,000 unsolicited email messages, so-called "spam," most of which were

3    sent to the mailboxes of former Azoogle users. The history of this lead, as recounted by Nella

4    White, is as follows. According to Nella White, on the night of October 25-26, 2005, the ASIS

5    email service received many messages regarding real estate financing. Declaration of Nella White in

6    Support of Opposition to Motion to Dismiss ("White Motion to Dismiss Opposition Decl."), ¶ 5.

7    White became aware of these e-mails because many of the emails were sent to addresses that were

8    no longer active. *Id.*, ¶ 5. To see if they were spam, she aliased these addresses to a single account

9    name. *Id.*, ¶ 5. White found that many of the emails directed recipients to URLs in the form

10   xxmort.com or xxmort.net, where the "x" consisted of any number or letter, causing White to

11   conclude that the e-mails were related. *Id.*, ¶ 6. According to White, although the emails directed

12   recipients to a number of different web sites, the various sites were "exactly the same." *Id.*, ¶ 4.

13   On October 27, 2005, White filled out a form on one of these web sites, wumort.net.[3] A

14   "whois" search of the domain name wumort.net indicates that that web site was registered to an

15   individual named John Dillinger with a physical address in Texas. Singleton Opposition Decl., Ex.

16   P. ASIS witness Carl Scoles states in a declaration that the web page White saw on October 27,

17   2005 was "virtually the same" as Azoogle's site, lowrateadvisors.com. Grabowski Decl., Ex. H

18   (Declaration of Carl Scoles (2)).[4] White states that she chose the web site because "it clearly had

19   been sent to a large percentage of my customer base, listed alphabetically, leading me to suspect

20   they had been gathered by means of a Directory Harvest Attack." *Id.*, ¶ 7. White filled in the form

21   on the web page with fictitious information about an individual named "Bruce Wolf." *Id.*, ¶¶ 7-9.

22   She does not state the time at which she uploaded the Bruce Wolf information. *Id.*

23

24    [3] Although White stated in her declaration that she typed the lead into wumort.net, she attached

25    a page to her declaration – purportedly the blank page she typed the lead into – carrying a vcmort.com
      footer. At oral argument, Plaintiff stated that the web site White actually typed the Bruce Wolf lead into

26    was wumort.net.

27    [4] Scoles explains in his declaration that on July 10, 2007, he discovered a web site titled
      lowrateadvisors.net which included a link to Azoogles lowrateadvisors.com. According to Scoles, both
      the dot-com and the dot-net addresses contained images that were identical to the wumort.net website

28    that White says she typed the Bruce Wolf lead into.

United States District Court

For the Northern District of California

1      The telephone number White provided was a real number, attached to an answering machine

2 to record responses to the Bruce Wolf lead. *Id.*, ¶ 9. A transcript of the messages received at the

3 number shows that the next day, Friday October 28, 2005, eight calls were received from mortgage

4 brokers for the fictitious Bruce Wolf, between 10:34 a.m. and 3:25 p.m. Declaration of Teresa

5 Singleton in Support of Opposition to Motion to Dismiss ("Singleton Motion to Dismiss Opposition

6 Decl."), Ex. A (transcript of telephone messages).[5]

7      In a recent declaration, dated January 31, 2008, White stated for the first time that after she

8 submitted the Bruce Wolf information at the wumort.com web site[6] she attempted to submit lead

9 information into another data entry form on a different web site with a similar URL that was also

10 listed in some of the Emails. Declaration of Nella White in Opposition to Azoogle's Motion for

11 Summary Judgment ("White Opposition Decl."), ¶ 2. White's declaration does not reveal the URL

12 of this web site. She used new fictitious information but the same telephone number and received an

13 error message stating that the submission had been rejected due to duplicate field information. *Id.*

14 ████████████████████████████████████████████████████████████

15 ████ Declaration of Richard E. Grabowski in Support of Motion for Summary Adjudication of

16 Issues ("Grabowski Motion Decl."), Ex. 1 at AZ 22. According to Azoogle, it received the lead from

17 Seamless Media Corp. ("Seamless Media"). Grabowski Motion Decl., Ex. R (Azoogle interrogatory

18 responses). █████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████

20 ████████████████████████████████████ Grabowski Motion Decl., Ex. 1

21 (Insertion Order) at AZ 5. █████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 █████████████████ ) *Id.* at AZ 20. █████████████████████████████

24 ████████████████████████████████████████████████████████████

25      [5] Plaintiff asserts that from these messages, Plaintiff's attorneys were able to identify nine

26 separate mortgage companies who were responding. Plaintiff's Motion at 2. It is unclear how
Plaintiff's attorneys arrived at this figure, as only eight messages were recorded, and of the eight

27 messages, four were left by two mortgage brokers, both of whom left two messages.

28      [6] Presumably, White meant wumort.*net* rather than wumort.*com*.

United States District Court
For the Northern District of California

1 ███████████████████████████████████████████████████████ *Id.*

2 at AZ 5. █████████████████████████████████████████████████

3 ██████████████████ Singleton Opposition Decl., Ex. D (Mossanen Depo.) at 55.

4      According to Jay Williams, a principal at Seamless Media, at the time it provided the Bruce

5 Wolf lead to Azoogle, Seamless purchased all of its leads from third parties. Burgoyne Motion

6 Decl., Ex. M (Declaration of Jay Williams, dated December 10, 2007) ("First Williams Decl."), ¶ 17.

7 According to Williams, it was not uncommon for a lead to travel through several parties before it

8 reached Seamless Media. *Id.* Williams further states that at the time Azoogle and Seamless Media

9 had entered into the Insertion Order, Seamless Media had a good reputation, had never been accused

10 of violating the CAN-SPAM Act and had never been listed on ROKSO. *Id.*, ¶ 19. Seamless Media

11 obtained the Bruce Wolf lead from a third-party vendor of mortgage leads, Scribe Interactive

12 ("Scribe"), which, according to Williams, also had a good reputation in the mortgage lead industry.

13 *Id.*, ¶ 22. In response to an inquiry to Scribe regarding the Bruce Wolf lead, the president of Scribe,

14 Steve Soffer, stated that one of *Scribe's* vendors had obtained the lead from an individual named

15 John Stothers. Burgoyne Decl., Ex. N (Declaration of Jay Williams, dated December 11, 2007)

16 ("Second Williams Decl."), Ex. A. (November 7, 2005 email from Steve Soffer to Jay Williams

17 regarding source of Bruce Wolf lead).

18      According to Azoogle, it sold the Bruce Wolf lead to another lead aggregator, eLeadZ, as

19 well as to Quicken Loans. *See* Grabowski Motion Decl., Ex. D (Azoogle's Response to request for

20 Admission, No. 22 and Amended Admission No. 19).[7] The code that accompanied the lead when it

21 was sent to Quicken Loans reflects the "lead type" as AZIQL. Grabowski Motion Decl., Ex. F.

22 According to ASIS, this indicates that the lead came from LowRateAdvisors.com. Plaintiff's

23 Motion at 3.[8]

24

---

25      [7]ASIS also asserts the lead was sold to Aegis Lending but does not cite any evidence in support
26 of that assertion. *See* Plaintiff's Motion at 2.

27      [8] At oral argument, Azoogle stipulated that the AZIQL code referred to Azoogle's web site
lowrateadvisors.com. According to Azoogle, this code does not indicate that the lead actually came
28 from lowrateadvisors.com but rather, reflects that the lead conforms to the offer criteria in relation to
which Quicken sought to purchase leads from Azoogle.

1     On November 2, 2005, Quicken Loans contacted Azoogle to learn more about the Bruce
2   Wolf lead, stating that it received an inquiry from an attorney who represented a consumer who had
3   received spam and had been referred to Quicken Loans by Azoogle. Declaration of Jason Singleton
4   in Opposition to Motion for Summary Judgment ("Singleton Opposition Decl."), Ex. G at QL 84-85.
5   On November 8, 2005, Azoogle responded, stating "the affiliate that provided Azoogle the lead" was
6   John Stothers. *Id.*

7                              **7.     The Emails**

8     Plaintiff alleges that Defendants sent over 10,000 deceptive and unsolicited emails ("the
9   Emails") to ASIS's server during the period between October 25, 2005 and November 14, 2005.
10  SAC at 7. The Emails were provided to the Court in electronic form. Declaration of Nella White in
11  Support of Plaintiff's Motion for Summary Adjudication of Issues ("White Motion Decl."), Ex. E.
12  According to ASIS, all of the Emails were sent to accounts at asis.com. White Motion to Dismiss
13  Opposition Decl., ¶ 5. They were obtained by ASIS by aliasing emails directed to former user
14  addresses to an account for a user identified as "ng." Declaration of Dr. Frederick B. Cohen in
15  Support of AzoogleAds.com, Inc.'s Motion for Summary Judgment or in the Alternative Summary
16  Adjudication ("Cohen Decl.") at 5. Based on documents provided to Azoogle by ASIS vendor,
17  Falcon Knight, Azoogle's expert, Frederick Cohen, has concluded that the email addresses of 1,507
18  ASIS former users were aliased to the ng account. *Id.*

19    According to Cohen, in order for the emails at issue in this case to be sent to the ng account,
20  ASIS must have paid Postini for these accounts, as Postini would have sent a notice to senders that
21  the addresses were invalid if the fee had not been paid. *Id.* at 6. In addition, if the accounts had not
22  been aliased, ASIS's server would have produced error messages informing senders that the
23  accounts were not active and valid. *Id.* Further, Cohen posits that ASIS likely altered its spam
24  filtering to allow the emails to come through, as Postini would almost certainly have filtered the
25  emails if ASIS had not done so. *Id.*

26    The parties disagree with respect to the number of emails at issue. According to ASIS's
27  investigator, Josh Mohland, there at 12,756 emails at issue. Grabowski Motion Decl., Ex. T
28  (Declaration of Josh Mohland) at 1. According to Azoogle's expert, Frederick Cohen, the emails at

                                              11

1    issue consist of 1,421 individual messages, some or all of which were sent to multiple addresses.

2    Cohen Decl. at 7. According to Cohen, many of the Emails were not received during the period

3    alleged in the complaint. *Id.* at 7-8; *see also* Cohen Decl., Ex. B (Supplementary Disclosures) at 14

4    (stating that Emails contained date and time stamps). ASIS asserts, however, that Cohen's opinion

5    is not valid with respect to the date stamps, pointing to Nella White's statement that the ASIS's

6    "Postfix" system wasn't in place in 2005. *See* ASIS Reply at 3 (citing Declaration of Nella White in

7    Opposition to Azoogle's Motion for Summary Judgment ("White Opposition Decl."), ¶ 5).

8        According to ASIS investigator, Carl Scoles, 110 different subject lines were used in the

9    Emails and 9,737 of the Emails contain "bad" subject lines. Grabowski Decl., Ex. H (Scoles (2)

10   Decl.) at ¶ 3 & Ex. A-2. According to Mohland, all of the Emails contain false headers, a conclusion

11   that is based on Mohland's comparison of the IP addresses of the sender of the Emails with the

12   domain names listed in the message ID or From: header. Grabowski Motion Decl., Ex. T

13   (Declaration of Josh Mohland) at 2. To determine the registrants of IP addresses, Mohland used the

14   ARIN "whois" database. *Id.* at 5. Relying, in part, on Mohland's conclusions, ASIS expert Jeffrey

15   Posluns also concluded that the header information was false. Posluns explained his conclusions as

16   follows:

17           In many of the emails, the sending IP address' reverse DNS
             information does not match the sender's email domain name nor does
18           it match the domain name with which the sending host identifies itself.
             While this may occur in some virtual hosting environments, many of
19           the IP addresses belong to the computers of individuals making use
             of a standard internet provider to access the internet. This indicates
20           that the header information is false. This false information was
             generated at the time that the emails were sent using a program that
21           specifically generates false header information while sending emails.

22           An investigation of the IP addresses in the email headers indicates that
             the emails were sent or relayed from individual computers making use
23           of standard internet service providers for access to the internet. In
             order to send out the subject emails, these computers would have been
24           infected with a malicious code (commonly referred to as a virus,
             Trojan, or botnet application) and made members of a botnet. The use
25           of a botnet conceals the true sender of the emails from the receiving
             ISP.

26

27   Grabowski Motion Decl., Ex. M (Plaintiffs' Expert Witness Disclosure of Jeffrey Posluns) at 6-7.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Azoogle's expert, however, questions the validity of the Mohland's study and Poslun's

2 conclusions. He states that "IP address data available through a whois lookup does not reliably

3 indicate IP address use." Cohen Decl., ¶ 58. He further states it is common that a sender's actual

4 identity does not correspond to host data pertaining to the IP address of the email server from which

5 the sender transmits the emails. Cohen Decl., ¶ 59. Cohen concludes, Mohland's "method of

6 inferring a sender based on host data pertaining to the IP address of the server from which an email

7 is transmitted is inherently unreliable and is not based on any generally accepted forensic

8 methodology." *Id.* He also states that the Emails could have been sent using an Anonymizer or an

9 Onion Router rather than a botnet. *Id.*, ¶¶ 29-30.

10    According to ASIS's expert, Posluns, and investigators Scoles and Mohland, a connection

11 between the Emails can also be found on the basis of the facts that the URLs referenced in the emails

12 contain a number of identical images. Posluns explains as follows:

13 > An analysis of the IP addresses for the landing pages of the URLs
> contained in the subject emails clearly show the landing pages are
14 > connected. The URL in 5,569 of the subject emails open an identical
> page, or a page containing identical images to those seen at
15 > WUMORT.NET – the page that Nella White used to enter the "Bruce
> Wolf" lead in October of 2005. Of the 5,569 emails, 4,217 linked to
16 > an identical page as that seen by Nella White in October 2005. The
> other 1,352 linked to pages containing at least 6 of the same image
17 > files used in the wumort.net web page. When a comparison of the IP
> addresses of the URL links were made, a connection became apparent
18 > between the 92 web domains in 11,418 of the subject emails.

19 > The probability is extremely remote that landing pages from different
> emails will contain the same images and be housed on a newtork of the
20 > same IP addresses and not be from the same source. There are some
> four trillion possible IP addresses on the Internet, making coincidences
21 > relating to IP addresses very unlikely.

22 Grabowski Motion Decl., Ex. W (Plaintiffs' Expert Witness Disclosure of Jeffrey Posluns) at 9-10.

23 *See also* Grabowski Decl., Ex. S (Declaration of Carl Scoles re Supplemental Disclosure Six

24 Amended), ¶ 15 & Ex. 5 thereto. Scoles also concludes, based on similar words and phrases used in

25 many of the Emails, that they came from the same source. *See* Grabowski Decl., Ex. H at 3.

26    Posluns does not state in his expert disclosures that he relied on the Wayback Machine for

27 images of the web sites referenced in the Emails. However, ASIS states in its Opposition that this is

28 how the comparison was made. ASIS Opposition at 22. Scoles also states in his study that he relied

United States District Court
For the Northern District of California

1  on the Wayback Machine. *See* Grabowski Decl., Ex. H at 2. Azoogle's expert, Frederick Cohen,

2  however, states that the Wayback Machine is not an accurate representation of historical Web

3  content and cannot be relied on for forensic purposes. Cohen Decl., ¶¶ 49-50.

4        The parties agree that the Emails didn't contain physical opt-out addresses. Joint Statement

5  of Stipulated Facts, No. 5. With respect to the question of whether the Emails contained valid

6  electronic opt-out links at the time they were sent, ASIS witness Carl Scoles concludes that some of

7  the Emails contained no unsubscribe links and the unsubscribe links contained in many of the

8  Emails are either questionable or invalid. Grabowski Decl., Ex. H (Declaration of Carl Scoles (2)) at

9  ¶ 4 & Ex. A-1. However, with respect to the allegedly questionable and invalid links, ASIS

10  admitted in interrogatory responses that "it cannot determine if any of these email unsubscribe

11  functions ever actually worked." Burgoyne Decl., Ex. P.

12        According to ASIS witness Scoles, the Emails contained at least 110 different web domain

13  titles. *Id.* at 1. Azoogle, in turn, presents evidence that 81 of these URLs were owned by n

14  individual named Alex Polyakov in 2005-2006. Declaration of Adam Schneider in Opposition to

15  Plaintiff ASIS Internet Services, Inc.'s Motion for Summary Adjudication of Issues ("Schneider

16  Opposition Decl."), ¶ 3.

17        **B.    Plaintiff's Claims and Azoogle's Defenses**

18        In its Second Amended Complaint, Plaintiff asserts a federal law claim under the CAN-

19  SPAM Act of 2003, 15 U.S.C. §§ 7701 *et seq.*, and a state law claim based on California Business

20  and Professions Code § 17529.5. Plaintiff's CAN-SPAM Act claim is based upon the following

21  specific alleged violations: 1) 15 U.S.C. § 7704(a)(1), prohibiting the transmission of email

22  messages with false or misleading header information, based on the allegations that the Emails were

23  sent using stolen or hijacked Email identities and that they included domain names that were

24  registered to unknown and false entities; 2) 15 U.S.C. § 7704(a)(2), prohibiting the transmission of

25  email messages with deceptive subject headings, based on the allegation that the subject lines in the

26  Emails were intended to get someone to open the messages by telling them their loan was approved;

27  the misspellings in the email subject lines were also misleading, ASIS alleges, because they were

28  intended to evade Plaintiff's spam blocking hardware; 3) 15 U.S.C. § 7704(a)(3), requiring the

14

United States District Court

For the Northern District of California

1 inclusion in commercial electronic email of a valid electronic opt-out link; 4) 15 U.S.C.

2 § 7704(a)(5), requiring the inclusion in commercial email addresses of a valid physical postal

3 address of a sender; 5) 15 U.S.C. § 7704(b)(1), establishing that CAN-SPAM Act violations shall be

4 considered "aggravated violations" if the email address of the recipient was obtained through

5 directory harvests or dictionary attacks; and 6) 15 U.S.C. § 7704(b)(2), establishing an aggravated

6 violation where the email addresses were obtained using automated tools or scripts.

7 Azoogle, in turn, asserts the following eleven affirmative defenses: 1) ASIS has failed to

8 state a cause of action upon which relief may be granted; 2) with respect to the California state law

9 claim, ASIS assumed the risk and contributed to its own damages; 3) the allegations in the complaint

10 fail to confer personal jurisdiction over Azoogle; 4) any loss, injury, or damage ASIS incurred was

11 proximately caused by third parties or non-parties whom Azoogle neither controlled nor had the

12 right to control; 5) ASIS's claims are barred by the doctrine of unclean hands and therefore ASIS

13 should be estopped from bringing this lawsuit; 6) ASIS failed to mitigate its damages; 7) damages

14 were proximately caused by ASIS and therefore require an allocation of fault; 8) ASIS consented to

15 the acts of Azoogle alleged in the complaint; 9) ASIS waived any claim against Azoogle alleged in

16 the complaint; 10) ASIS has failed to bring this action in the appropriate venue; 11) ASIS's claims

17 are barred under the doctrine of preemption. Answer to Amended Complaint, Docket No. 134.

18     **C.**    **The Motions**

19            **1.**    **ASIS Motion**

20 ASIS seeks summary judgment in its favor with respect to eight of Azoogle's affirmative

21 defenses as well as five issues that are key to ASIS's claims. ASIS asserts that it is entitled to

22 summary judgment on the following affirmative defenses:

23 Assumption of risk: ASIS argues that the affirmative defense of assumption of risk does not

24 apply to Plaintiff's claims because that doctrine applies to negligence claims, not statutory claims as

25 are asserted here.

26 Loss caused by third parties: ASIS argues that this defense fails because it is based on

27 negligence concepts of proximate causation and control, whereas the statutory claims asserted by

28

15

United States District Court
For the Northern District of California

1  ASIS turn on whether Azoogle "procured" the Emails. This standard, ASIS asserts, does not turn on
2  control or proximate causation.

3      Unclean hands: ASIS asserts that its conduct – and particularly, its actions that allowed it to
4  receive the Emails, namely, aliasing former user accounts and altering its spam filters – does not
5  amount to unclean hands and that assertion of this affirmative defense is an attempt to place the
6  burden of receiving spam on the recipient.

7      Failure to mitigate damages: ASIS argues that the doctrine of mitigation of damages does
8  not apply to either of its claims, citing *Phillips v. Netblue, Inc.*, 2006 WL 3647116 (N.D. Cal.).

9      Damages caused by ASIS: ASIS argues that the affirmative defense that damages were
10 proximately caused by ASIS is based on tort concepts that are not applicable to Plaintiff's statutory
11 claims.

12     ASIS invited or consented to alleged acts of Azoogle: ASIS argues that there is no legal or
13 factual basis for Azoogle's consent affirmative defense because Azoogle has presented no evidence
14 that the Emails were solicited by the intended recipients.

15     Waiver: ASIS challenges Azoogle's waiver affirmative defense, arguing that Azoogle has
16 not explained the basis for this affirmative defense.

17     Preemption: ASIS argues that this affirmative defense fails because although the CAN-
18 SPAM Act contains a preemption clause, 15 U.S.C. § 7707(b), it also contains a savings clause
19 which permits state laws that prohibit conduct in cyberspace that sounds in fraud.  According to
20 ASIS, its state law claim sounds in fraud and therefore is not preempted

21     In addition to Azoogle's affirmative defenses, ASIS seeks summary judgment on a number
22 of issues related to its claims.  The issues on which ASIS seeks summary judgment are as follows:

23     Whether ASIS is an Internet Access Provider ("IAS") as defined under the CAN-SPAM Act
24 and an electronic mail service provider under California law: ASIS argues that it is entitled to
25 summary judgment that it is an Internet Access Provider as that term is defined under the CAN-
26 SPAM Act and further, that it is an electronic mail service provider under California Business and
27 Professions Code § 17529.1(h).

28

16

1    Whether the Emails were sent to or transmitted to ASIS email accounts: ASIS argues that

2  there is no issue of material fact regarding whether the Emails were sent or transmitted to ASIS

3  email accounts, pointing to evidence that the Emails all contain "@asis.com" in the address.

4    Whether the Emails contained false header information: ASIS asserts that it can be

5  established, as a matter of law, that the headers on the Emails are false under both the CAN-SPAM

6  Act and Cal. Bus. & Prof. Code § 17529.5. First, it asserts that by comparing the originating source

7  IP address (in the email's header information) and the sending email domain names, it can be

8  established that the headers on the Emails are false. According to ASIS, this is because it is an

9  accepted industry standard that the sending domain name must match the sending IP address. Using

10  this standard, ASIS witness Josh Mohland has conducted a study on the basis of which he concludes

11  the Email headers are false. Second, ASIS argues that the DomainKey authentication system is also

12  an industry standard that can be used to show the Email header information is false. According to

13  ASIS, the DomainKey authentication system was created by Yahoo and requires that a DomainKey

14  authentication code be included in the header of every email. Mohland concludes in his study that

15  the absence of such a DomainKey authorization code in the headers of most of the Emails indicates

16  that the headers are false and misleading. Finally, ASIS asserts that all of the Emails were sent in a

17  nonrandom fashion from different computers in alphabetical order of intended recipients and that the

18  contents of the Emails were very similar, supporting the conclusion that the Emails were sent by a

19  "botnet" that hijacked the computers of individual users to send the spam.

20    Whether the Emails contain false or misleading subject lines: Citing to a declaration by ASIS

21  witness Carl Scoles, who reviewed the Emails and classified their subject lines, ASIS asserts that

22  there is no dispute that 9,737 of the emails have false or misleading subject lines under both the

23  CAN-SPAM Act and Cal. Bus. & Prof. Code § 17529.5.

24    Whether the Emails contained a valid unsubscribe option: ASIS asserts, based on the study

25  of Carl Scoles, that none of the Email contain a physical unsubscribe address and 12,625 of the

26  Emails don't contain a valid unsubscribe link.

27

28

17

United States District Court

For the Northern District of California

### 2.    Azoogle Opposition to ASIS Motion

Azoogle objects to evidence that ASIS cited in its Motion and also asserts that ASIS should be barred from presenting evidence relating to various issues with respect to which ASIS failed to produce – or in some cases, preserve – relevant evidence. As noted above, the Court declines to rule on Azoogle's objections because this evidence, even if admissible, does not change its result.

Next, Azoogle argues that ASIS should not be allowed to use a summary judgment motion to establish specific factual issues rather than to determine entire claims.

On the merits, Azoogle makes the following arguments with respect to the issues on which ASIS seeks summary judgment:

Whether ASIS is an Internet Access Service ("IAS") as defined under the CAN-SPAM Act and an electronic mail service provider under California law: Although Azoogle has stipulated both that ASIS is an IAS as that term is defined under the CAN-SPAM Act and that it is an electronic mail service provider under California Business and Professions Code § 17529.1(h), it argues nonetheless that ASIS was not *acting* as an IAS or an electronic mail service provider when it intercepted the email of its former users. Azoogle further asserts that ASIS lacks standing under the CAN-SPAM Act because it has not been "adversely affected" by the alleged violations, as required under 15 U.S.C. § 7706(g)(1). In support of this position, Azoogle cites *Gordon v. Virtumondo, Inc.*, 2007 WL 1459395 (W.D. Wash. May 15, 2007). Azoogle also argues that it wasn't an electronic mail service provider under California law because Postini likely filtered out the spam and, therefore, with respect to the Emails, ASIS was not an intermediary in sending and receiving email as required under California law.

Whether the Emails were sent to or transmitted to ASIS email accounts: Azoogle does not address ASIS's argument that it is entitled to summary judgment that the Emails were sent or transmitted to ASIS email accounts.

Whether the Emails contained false header information: Azoogle rejects ASIS's evidence in support of summary judgment, arguing that neither Mohland nor Scoles is an expert and that the methodologies used by both are flawed. Azoogle cites to its own expert's testimony that there is no

United States District Court
For the Northern District of California

industry standard regarding email authentication. It also challenges the evidence that underlies the conclusion that a botnet was used to send the Emails.

Whether the Emails contain false or misleading subject lines: Azoogle argues that ASIS's position on this issue fails because it is based on the opinion of a lay witness, Carl Scoles, who didn't tie his findings to particular emails. In any event, Azoogle argues, many of the subject lines (e.g., "Excellent mortgagee [sic]," "Offering funding," "Pre-aprovedd [sic] rate" are not likely to mislead a recipient within the meaning of 15 U.S.C. § 7704(a)(2).

Whether the Emails contained a valid unsubscribe option: Azoogle does not dispute that the Emails don't contain physical unsubscribe addresses but challenges ASIS's position with respect to the unsubscribe links, pointing to ASIS's stipulation that it does not know if the links ever worked.

With respect to ASIS's arguments regarding Azoogle's affirmative defenses, Azoogle expressly addresses only two of them in its Opposition: the unclean hands and consent affirmative defenses.[9] Regarding the unclean hands affirmative defense, Azoogle argues that ASIS has systematically violated the statutory privacy rights of users, former users and third parties in order to obtain millions of dollars through litigation and that ASIS should not be permitted to profit from this conduct in this litigation. Azoogle asserts that its consent affirmative defense should not be stricken because ASIS consented to receipt of the Emails by aliasing former user names and altering spam filters to allow the Emails to be sent.

### 3.    Azoogle Motion

In its Motion, Azoogle seeks summary judgment on the following grounds:

Lack of standing to assert CAN-SPAM Act claim: Azoogle argues that ASIS does not have standing to assert a CAN-SPAM Act claim because there is no evidence that it was adversely affected by the Emails and because ASIS was not acting as an IAS when it collected the Emails.

Lack of evidence that Azoogle "procured" the Emails: Azoogle argues that it can only be liable under the CAN-SPAM Act if it is shown to have "procured" the transmission of the spam and

---

[9] The Court notes, however, that Azoogle's failure to address the preemption affirmative defense in its Opposition appears to have been an oversight as Azoogle did raise this issue in its own summary judgment motion, as discussed below.

United States District Court
For the Northern District of California

1   that ASIS has presented no evidence sufficient to create a jury question on this issue.  Azoogle

2   points in particular to 15 U.S.C. § 7706(g)(2), which specifies that an Internet Access Service

3   provider may only sue as a private attorney general if Azoogle  initiated the Emails "with actual

4   knowledge, or by consciously avoiding knowing" that it was inducing another person to violat the

5   CAN-SPAM Act.  Azoogle further asserts that undisputed evidence shows that it did not know and

6   could not have known that Seamless media would engage in a pattern or practice of violating the

7   CAN-SPAM Act.

8        Lack of evidence of CAN-SPAM Violations: Azoogle argues that ASIS has pointed to no

9   significant, probative evidence of any CAN-SPAM violations and therefore, Plaintiff's CAN-SPAM

10  Act claim should be dismissed.  First, Azoogle argues that the evidence shows no actionable emails.

11  In support of this contention, Azoogle points to evidence that only 242 of the Emails were sent

12  during the relevant time period; of these, only 109 were directed at then-current ASIS users, while

13  the remaining e-mails were sent to the ng mailbox.  The latter, Azoogle argues, were not actually

14  transmitted to the former users' mailboxes and therefore do not conform with the CAN-SPAM Act's

15  definition of "electronic mail messages."  As to the former, Azoogle asserts, of the 109 emails, 11

16  were duplicates created by ASIS's aliasing mechanism, leaving 98 emails.  Counting all then-current

17  ASIS users listed in these messages, Azoogle argues, 175 email messages directed to then-current

18  users.  These, however, were likely filtered out by Postini and thus probably were not received by

19  any ASIS users.

20        Second, Azoogle rejects the analysis of  Plaintiff's investigator Mohland on the question of

21  whether the header information in the Emails is materially false.  Mohland completed a study

22  comparing domain names and IP addresses in the Emails that was disclosed to Azoogle in response

23  to the contention interrogatories (discussed above). Azoogle argues that the study is flawed in

24  numerous respects, including Mohland's reliance on "whois" lookups, his use of 2007 registration

25  data rather than data pertaining to the period in which the Emails were sent and his use of a flawed

26  methodology.

27

28

20

United States District Court

For the Northern District of California

1   Third, Azoogle argues that there is no significant probative evidence that the Emails were

2   sent using a "directory attack" to gather ASIS user addresses, and therefore ASIS's assertion that the

3   alleged violations were "aggravated violations" under 15 U.S.C. § 7704(b)(1)(A) fails.

4       Deficiencies relating to Cal. Bus. & Prof. Code Claim § 17529.5: Azoogle argues that ASIS

5   was not an electronic mail service provider under California law for the same reasons it lacks

6   standing under the CAN-SPAM Act, namely, that the Emails were likely filtered by Postini and did

7   not reach any active users. Second, Azoogle argues that ASIS fails to offer any specific probative

8   evidence that Azoogle had anything to do with the initiation of the Emails and therefore, it cannot be

9   established that Azoogle is an "advertiser" under Section 17529.1. Third, Azoogle argues that ASIS

10  fails to offer any specific probative evidence that the Emails contained falsified, misrepresented, or

11  forged header information. Finally, Azoogle argues that the Section17529.5 claim is preempted by

12  the CAN-SPAM Act because it does not sound in tort, citing *Klefman v. Vonage Holdings Corp.*,

13  2007 WL 1518650 (C.D. Cal. May 23, 2007).

14      Evidence relating to Unclean Hands and Consent: Azoogle argues that the Court should grant

15  summary judgment in its favor based on its unclean hands and consent affirmative defenses for the

16  same reasons discussed above in connection with Azoogle's Opposition to ASIS's summary

17  judgment motion.

18          **4.    ASIS Opposition**

19      ASIS responds to Azoogle's arguments as follows:

20      Standing: ASIS argues that Azoogle's arguments regarding standing are flawed. First, ASIS

21  argues that the assertion that ASIS was not acting as an IAS because it was acting to gather evidence

22  by collecting the Emails in the ng mailbox is contradicted by 15 U.S.C. §7707(c), which provides

23  that:

24          [n]othing in this chapter shall be construed to have any effect on the
            lawfulness or unlawfulness, under any other provision of law, of the
25          adoption, implementation, or enforcement by a provider of Internet
            access service of a policy of declining to transmit, route, relay, handle,
26          or store certain types of electronic mail messages.

27  15 U.S.C. §7707(c). Second, ASIS argues that the adverse effects test adopted in *Gordon*, cited by

28  Azoogle, is likely incorrect, citing language in the Act's statutory damages provision that allows for

21

United States District Court
For the Northern District of California

1  damages not only for messages that are "transmitted" but also for those that are "attempted to be
2  transmitted." 15 U.S.C. § 7706(g)(3)(A). Third, ASIS argues that in any event, ASIS has
3  established adverse effects under *Gordon*.

4      Whether Azoogle "procured" the Emails: ASIS argues that Azoogle has overstated the
5  "consciously avoiding knowing" requirement in 15 USC § 7706(g)(2) and that evidence that
6  Azoogle knew its third-party vendor regularly hired spammers to obtain leads – even if Azoogle was
7  not aware of who actually sent the spam – is sufficient to meet this test. In support of this position,
8  ASIS points to the following evidence:

9  •    the Insertion Order between Azoogle and Seamless media specifically permitted the use of
10      email to generate leads, indicating that Azoogle and Seamless were engaged in joint internet
11      marketing using email.

12  •    Azoogle's November 8, 2005 email to Quicken loans referred to John Stothers as an affiliate,
13      rather than as an "affiliate's affiliate," indicating that Stothers was an Azoogle affiliate.

14  •    The code in the lead that was sent to Quicken Loans designated the lead as coming from
15      lowrateadvisors.com.

16  •    The lowrateadvisors.com's web page was almost identical to the web page White completed,
17      which was referenced in the Emails, indicating that Azoogle knew about the web sites
18      referenced in the Emails and was aware the Emails were being sent to generate leads.

19  •    Evidence that ASIS asserts shows that the Bruce Wolf lead was transmitted through
20      Azoogle's Lead Agent system in real time, indicating that the wumort.net page was
21      configured in advance so at to link up with Azoogle's Lead Agents system.

22  •    Testimony of Julian Mossanen regarding white labeling, which ASIS asserts shows that
23      Azoogle permitted its web pages to be copied in order that these vendors could generate
24      leads for Azoogle.

25  •    The statement by White in her January 31, 2008 Declaration that when she tried to enter
26      fictitious information into another web site referenced in the Emails using the same
27      telephone number she had used for "Bruce Wolf" she received an error message, indicating
28      that both web sites were linked through Azoogle's Lead Agents system.

United States District Court
For the Northern District of California

1  •     Testimony by Julian Mossanen and others at Azoogle indicating that Azoogle did not

2       investigate its third-party vendors before entering into insertion agreements with them and

3       did not have any official policy for ensuring that its vendors did not use spam to generate

4       leads.

5  •     The conclusions of investigators Mohland and Scoles and expert Posluns that the Emails

6       were all sent by the same entity.

7       <u>Sufficiency of ASIS's Cal. Bus. & Prof. Code Claim § 17529.5</u>: ASIS rejects Azoogle's

8  argument that it doesn't have standing to assert a claim under Cal. Bus. & Prof. Code Claim §

9  17529.5, pointing out that Azoogle has already stipulated that ASIS is an electronic mail service

10  provider under California law. Second, ASIS argues that to the extent Azoogle procured the Emails

11  by entering into the Insertion Order with Seamless Media, it is an advertiser under California law.

12  Third, ASIS argues that its shown that the Emails contain false and deceptive headers. Finally,

13  ASIS asserts that the state law claim is not preempted under *Klefman v. Vonage Holdings Corp.*,

14  2007 WL 1518650 (C.D. Cal. May 23, 2007) because the claim sounds in fraud.

15       <u>Unclean Hands and Consent</u>: For the reasons stated in ASIS's Motion, ASIS asserts that both

16  the unclean hands and consent affirmative defenses fail.

17  **III.   ANALYSIS**

18       **A.   Legal Standard Applicable to Summary Judgment Motions**

19       Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

20  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

21  any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

22  P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a

23  genuine issue of material fact with respect to an essential element of the non-moving party's claim,

24  or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex*

25  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the

26  movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

27  genuine issue of material fact," that is, "that, on all the essential elements of its case on which it

28  bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

1  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this

2  showing, the burden then shifts to the party opposing summary judgment to designate "specific facts

3  showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all

4  reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S.

5  242, 255 (1986).[10]

6  **B.    The CAN-SPAM Act Claim**

7        The parties have raised a multitude of issues in their motions. The Court finds that two of

8  those issues are dispositive of Plaintiff's CAN-SPAM Act claim: 1) whether ASIS has standing

9  under the CAN-SPAM Act; and 2) whether there is evidence from which a reasonable jury could

10  conclude that Azoogle "procured" the Emails that are the subject of this action. With respect to both

11  questions, the evidence presented by the parties was voluminous. In addition, the case law regarding

12  the relevant legal standards was scant due to the fact that the CAN-SPAM Act was enacted so

13  recently. As a result, resolutions of these issues was difficult, presenting close calls. Nonetheless,

14  the Court concludes that the answer to both questions is "no." As a result, Azoogle is entitled to

15  summary judgment in its favor on Plaintiff's CAN-SPAM Act claim.

16        **1.    Standing Under the CAN-SPAM Act**

17        Azoogle asserts that it is entitled to summary judgment that ASIS has no standing under the

18  CAN-SPAM Act. The Court agrees.

19        The CAN-SPAM Act allows an IAS to bring an action for injunctive relief or damages for

20  where it is "adversely affected" by a violation of sections 7704(a)(1), 7704(b), or 7704(d) of the Act.

21  _____

22  [10] The parties dispute whether it is permissible to seek summary judgment as to discrete issues rather than claims. There is a split of authority on this question, which has not been addressed by the Ninth Circuit. *See SEC v. Thrasher*, 152 F. Supp. 2d 291, 295 (S.D.N.Y. 2001) (holding that summary

23  judgment motion by plaintiff was improper because it requested disposition of elements of a claim rather than judgment on the claim as a whole); *Arado v. General Fire Extinguisher Corp.*, 626 F. Supp. 506,

24  509 (N.D. Ill. 1985) (same); *G &C Auto Body, Inc. v. GEICO General Ins. Co.*, 2007 WL 4350909 (N.D. Cal. December 12, 2007). *But see Barker .v Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981)

25  (summary judgment may be appropriate as to issues as well as claims); *McDonnell v. Cardiothoracic & Vascular Surgical Associates, Inc.*, 2004 WL 1234138 (S.D. Oh. May 27, 2004) (same). While the

26  court finds

persuasive the reasoning in *McDonnell*, in which the court concluded that parties should be permitted

27  to seek summary judgment on discrete issues under some circumstances, it need not resolve this issue because it concludes that Azoogle is entitled to summary judgment on its CAN-SPAM Act claim.

28  Therefore, the Court does not reach Plaintiff's request for summary judgment on specific issues.

United States District Court
For the Northern District of California

24

United States District Court

For the Northern District of California

1  15 U.S.C. § 7706(g)(1). In *Hypertouch, Inc. v. Kennedy-Western University*, 2006 WL 648688

2  (N.D. Cal. March 8, 2006), the court held, on summary judgment, that the "adversely affected"

3  requirement was met where an IAS submitted a declaration "indicating that high spam loads ha[d]

4  caused decrease server response and crashes, led to higher bandwidth utilization, and forced

5  expensive hardware and software upgrades." *Id.* at * 4.

6      In contrast, in *Gordon v. Virtumundo, Inc.*, 2007 WL 1459395 (W.D. Wash. May 15, 2007),

7  the court found that the plaintiff was not adversely affected, even though it provided email service

8  and its users received spam, explaining its conclusion as follows:

9          Plaintiffs undisputedly have suffered no harm related to bandwidth,
           hardware, Internet connectivity, network integrity, overhead costs,
10         fees, staffing, or equipment costs, and they have alleged absolutely no
           financial hardship or expense due to e-mails they received from
11         Defendants. Plaintiffs have spam filters available to them, and such
           filters continue to become more sophisticated. Nor do Plaintiffs allege
12         that they use "dial-up," the costs associated with which were
           specifically discussed by Congress (and likely are becoming an
13         obsolete concern as high-speed broadband usage becomes the norm).
           Moreover, even if there is some negligible burden to be inferred from
14         the mere fact that unwanted e-mails have come to Plaintiffs' domain, it
           is clear to the Court that whatever harm might exist due to that
15         inconvenience, it is not enough to establish the "adverse effect"
           intended by Congress. Indeed, the only harm Plaintiffs have alleged is
16         the type of harm typically experienced by most e-mail users. The fact
           that Congress did not confer a private right of action on consumers at
17         large means that "adverse effect" as a *type* of harm must rise beyond
           the level typically experienced by consumers- *i.e.*, beyond the
18         annoyance of spam.

19  *Id.* at * 8. In support of this conclusion, the *Gordon* court looked to the legislative history of the

20  CAN-SPAM Act and in particular, the burden imposed by spam on internet access providers:

21         In the Committee Report, under the heading "Costs to ISPs,
           Consumers, and Businesses," the Senate Committee on Commerce,
22         Science, and Transportation found that "[s]pam imposes significant
           economic burdens on ISPs, consumers and businesses" because
23         "[m]assive volumes of spam can clog a computer network, slowing
           Internet service for those who share that network. ISPs must respond
24         to rising volumes of spam by investing in new equipment to increase
           capacity and customer service personnel to deal with increased
25         subscriber complaints." S. REP. NO. 108-102, at 6 (2003) (Comm.
           Rep. on CAN-SPAM Act of 2003 (S.877)). "Dictionary attacks" can
26         hijack a server, slowing it and making it appear that legitimate users
           are sending spam, and "web bugsient's computer. *Id.* at 3-4. Increased
27         costs of anti-spam software are "passed on as increased charges to
           consumers .... [and] some observers expect that free e-mail services ...
28         will be downsized." *Id.* at 6. The Committee also noted that

25

"[a]lthough Internet access through broadband connections is steadily growing, a dial-up modem continues to be the method by which a vast majority of Americans access the Internet and their e-mail accounts." *Id.* at 7. The "per-minute" and long distance charges for Internet connections for many e-mail users were exacerbated by time spent on manual spam filtering, resulting in additional per-customer costs. *Id.*

In subsequently describing the various enforcement provisions in the Act, the Committee discussed the private right of action provision at issue here, which would allow a provider of Internet access service adversely affected by a violation ... to bring a civil action.... This could include a service provider who carried unlawful spam over its facilities or who operated a website or online service from which recipient e-mail addresses were harvested in connection with a violation. . . .

*Id.* at \*6. The court concluded that the "adverse effect" requirement is satisfied only if an IAS alleges a particular type of harm and that harm is "significant." *Id.* at \*8.

This Court finds the reasoning of *Gordon* to be sound. Further, having carefully reviewed the evidence, the Court concludes that no reasonable jury could find, based on the undisputed evidence, that the Emails that are the subject of this action caused any significant adverse effect to ASIS. While there is some evidence that spam generally has imposed costs on ASIS over the years, there is *no* evidence that the Emails at issue in this action resulted in adverse effects to ASIS: there is *no* evidence in the record that any of the Emails either reached any active ASIS users (rather than being filtered by Postini) or were the subject of complaints to ASIS; there is *no* evidence in the record that ASIS had to increase its server capacity or experienced crashes as a result of the Emails; and there is *no* evidence in the record that ASIS experienced higher costs for filtering by Postini as a result of the Emails. Indeed, the monthly charge for filtering that Postini charged ASIS was somewhat lower in the second half of 2005, when the Emails were sent, than in the first half of 2005. In short, ASIS suffered no meaningful adverse effect as a result of the Emails of any kind. As a result, it does not have standing to assert its claims under the CAN-SPAM Act.

United States District Court
For the Northern District of California

1          **2.    Whether Azoogle Procured the Emails**

2          Azoogle asserts, as an independent basis for summary judgment, that there is no evidence

3    from which a jury could reasonably conclude that it "procured" the Emails as that term is used in the

4    CAN-SPAM Act.  The Court agrees.

5          Sections 7704(a) and (b) of the CAN-SPAM Act prohibit the "initiation" of certain types of

6    deceptive or misleading commercial email messages.  15 U.S.C. § 7704(a) & (b).  Section 7702(9)

7    defines "initiation" as follows:

8                 The term 'initiate", when used with respect to a commercial electronic
                  mail message, means to originate or transmit such message or to
9                 procure the origination or transmission of such message, but shall not
                  include actions that constitute routine conveyance of such message.
10                For purposes of this paragraph, more than one person may be
                  considered to have initiated a message.
11

12    15 U.S.C. § 7702(9).  The term "procure," in turn, is defined generally to mean "intentionally to pay

13    or provide other consideration to, or induce, another person to initiate such a message on one's

14    behalf."  15 U.S.C. § 7702(12).  A special definition, however, is provided where the action is

15    brought by an IAS.  15 U.S.C. § 7706(g)(2).  In particular, section 7706(g)(2) provides as follows:

16                In any action brought under paragraph (1), this chapter shall be applied
                  as if the definition of the term "procure" in section 7702(12) of this
17                title contained, after 'behalf' the words "with actual knowledge, or by
                  consciously avoiding knowing, whether such person is engaging, or
18                will engage, in a pattern or practice that violates this chapter."

19    15 U.S.C. § 7706(g)(2).

20          Neither party has cited to any case law that provides meaningful guidance as to the conscious

21    avoidance standard in the context of the CAN-SPAM Act, and the court has found none.  Therefore,

22    the Court looks for guidance to the doctrine of conscious avoidance that has been applied in criminal

23    law.  In criminal law, the doctrine of conscious avoidance has been defined as follows:

24                [w]hen knowledge of the existence of a particular fact is an element of
                  an offense, such knowledge is established if a person is aware of a
25                high probability of its existence, unless he actually believes it does not
                  exist.
26

27    *United States v. Netkalov*, 461 F.3d 309, 314 (2d Cir. 2006) (quoting *Leary v. United States*, 395

28    U.S. 6, 46 n. 93 (1969)).  The court in *Netkalov* explained, "essential to the concept of conscious

United States District Court
For the Northern District of California

1    avoidance [is] that the defendant must be shown to have decided not to learn the key fact, not merely
2    to have failed to learn it through negligence." *Id.* (quoting *United States v. Rodriguez*, 983 F.2d 455,
3    458 (2d Cir. 1993). The court continued, "a court can properly find wilful blindness only where it
4    can almost be said that the defendant actually knew. He suspected the fact; he realized its
5    probability; but he refrained from obtaining the final confirmation because he wanted in the event to
6    be able to deny knowledge." *Id.*

7         A separate question is what "fact" the defendant must have consciously avoided knowing.
8    Azoogle asserts that the defendant must have consciously avoided knowing that the particular
9    individual or entity that sent the spam would do so. Azoogle cites to *Hypertech* in support of this
10   assertion, quoting the court's statement in that case that the plaintiff had "failed to provide any
11   evidence that [the defendant] had actual knowledge or consciously avoided knowing of a current or
12   future violation of the CAN-SPAM Act by anyone who sent the emails at issue." 2006 WL 648688
13   (N.D. Cal. March 8, 2006) at * 5. ASIS argues that a defendant need not have specific knowledge of
14   the identity of the individual sending the spam to meet the "conscious avoidance" standard. The
15   Court agrees with ASIS.

16        First, Azoogle's reliance on *Hypertouch* is misplaced. The *Hypertouch* court did not
17   directly address whether conscious avoidance might be established, even where the defendant knew
18   nothing about a specific spammer, on the basis that the defendant consciously avoided knowing its
19   agent was procuring the transmission of spam by third parties on the its behalf. Indeed, the court
20   implied that "refusal to investigate" whether its agent was paying third parties to send spam on its
21   behalf *would* be a CAN-SPAM violation but found no evidence that defendants had engaged in such
22   conduct. *Id.* Second, it is evident from the plain language of the CAN-SPAM Act that an entity that
23   consciously avoided knowing that its agent was paying others to send spam on its behalf – even if it
24   had no knowledge of who was being paid to send the spam – would meet the special definition of
25   "procure" discussed above. This is because the agent, by paying others to send email on *its* behalf
26   would be engaging in a pattern and practice of violating the CAN-SPAM Act. Thus, the special
27   definition in § 7706(g)(2) would be satisfied.

28

28

The Court nevertheless finds that Plaintiff has failed to point to evidence sufficient to establish a jury question as to whether Azoogle "procured" the Emails at issue in this case under the definition discussed above. Although ASIS has pointed to significant evidence that Azoogle, during the relevant time period, did little to investigate the third party vendors it engaged, there is no evidence in the record from which a jury could conclude that Azoogle, in contracting with Seamless Media, made a deliberate choice not to know that Seamless Media would engage third parties to send out spam on Azoogle's behalf. The evidence cited by ASIS to establish knowledge on Azoogle's part is entirely speculative. Even assuming it is true that the Emails were sent by a single individual and that the lead was typed into a web site that was copied from Azoogle's lowrateadvisors site, this is insufficient to show that Azoogle consciously avoided knowing that the Emails would be sent. Further, while ASIS relies primarily on the allegation that Azoogle failed to adequately investigate its third-party vendors, ASIS has pointed to no evidence that if Azoogle *had* investigated Seamless Media prior to entering into the Insertion Order, it would have learned facts sufficient to show that Seamless Media was likely to engage in CAN-SPAM violations. There is no evidence in the record that would put Azoogle on notice that Seamless Media, or Seamless Media's vendors, obtained leads from spammers. Indeed, the only evidence on this subject is that Seamless Media had a good reputation at the time, and was obliged by its contract with Azoogle to follow the law.

Accordingly, the Court grants summary judgment in favor of Azoogle on the CAN-SPAM Act claim.

## C. The Cal. Bus. & Prof. Code § 17529.5 Claim

The Court also finds that Plaintiff's state law claim fails. Under California law, it is unlawful for an entity to "advertise" in a commercial email under certain circumstances. Cal. Bus. & Prof. Code § 17529.5(a). Azoogle did not send the offending spam. Nor did it knowingly "procure" the spam, as discussed above. At most, Azoogle may have benefitted from the spam (although even on this point, the evidence is scant). ASIS has cited to no California case law that suggests that a defendant that did not itself send spam advertising and did not knowingly commission another entity to send spam advertisements could be held liable under state law merely because it benefitted from

29

the spam. Indeed, to the extent a state law permitted the imposition of liability on such a basis it would not fall within the savings clause of the CAN-SPAM Act, which permits state law to regulate the use of electronic messages only to the extent those regulations are based on traditional principles of fraud. *See Kleffman v. Vonage Holdings Corp.*, 2007 WL 1518650 (C.D. Cal. May 23, 2007). Because the Court concludes that no reasonable jury could find that Azoogle "advertised" on the current record, Plaintiff's state law claim also fails.

## IV.    CONCLUSION

For the reasons stated above, Defendant's Motion is GRANTED on the basis that: 1) ASIS lacks standing to assert a CAN-SPAM Act claim against Azoogle; 2) Azoogle did not "procure" the Emails that are the subject of this action under the CAN-SPAM Act; and 3) Azoogle did not "advertise" for the purposes of Plaintiff's state law claim. Accordingly, Plaintiff's claims against Azoogle are dismissed with prejudice.

IT IS SO ORDERED.

Dated: March 27, 2008

JOSEPH C. SPERO
United States Magistrate Judge

Exhibit B

Jason K. Singleton, **State Bar #166170**
Richard E. Grabowski, **State Bar #236207**
**SINGLETON LAW GROUP**
**611 "L" Street, Suite A**
**Eureka, CA 95501**
**lawgroup@sbcglobal.net**

**(707) 441-1177**
**FAX  441-1533**

**Attorneys for Plaintiff, ASIS Internet Services**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASIS INTERNET SERVICES, a California corporation,**<br><br>          **Plaintiff,**<br>**vs.**<br><br>**OPTIN GLOBAL, INC., a Delaware Corporation, also dba Vision Media Limited Corp., USA Lenders Network, USA Lenders, and USA Debt Consolidation Service;**<br><br>**VISION MEDIA LIMITED CORP., a Common-wealth of Dominica Corporation, also dba Optin Global, Inc., USA Lenders Network, USA Lenders, and USA Debt Consolidation Service;**<br><br>**RICK YANG, also known as Qing Kuang Yang, aka Calvin Ho, individually, and as principal and owner of Vision Media Limited Corp. and Optin Global, Inc.;**<br><br>**PEONIE PUI TING CHEN, individually, and as president of Optin Global, Inc.;**<br><br>**ESTELA MARIE RICHIE, aka Stela; JOHN TERRENCE DORLAND, aka Terry; CHRIS VALLEY; BRUCE LERNER; MICHAEL GARCIA; and FRANCIS PRASAD all as individuals;**<br><br>**MICHAEL CUERVO, dba NORTHSTAR FINANCIAL, an unknown entity;** | **Case No. C 05-05124 JCS**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – VIOLATION OF CAN-SPAM ACT OF 2003 [15 U.S.C. § 7701, et seq.], CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17529.5, AND CIVIL CONSPIRACY**<br><br>**DEMAND FOR JURY TRIAL** |

**NORTH COUNTY LOANS, INC. a California**
**corporation;**

**NATIONAL FIDELITY FUNDING, an Indiana**
**corporation;**

**STATESIDE MORTGAGE, INC., a California**
**corporation;**

**AMERICAN HOME EQUITY CORPORATION, a**
**Delaware corporation;**

**QUICKEN LOANS INC., a Michigan**
**corporation;**

**AEGIS LENDING CORPORATION, a Delaware**
**corporation;**

**EFG FIRST, INC., a California corporation;**

**and DOES ONE through FIFTY, inclusive,**

  **Defendants.**

Plaintiff, **ASIS INTERNET SERVICES, a California corporation,** an Internet Access Provider**,** complains of Defendants **OPTIN GLOBAL, INC., a Delaware Corporation, also dba Vision Media Limited Corp., USA Lenders Network, USA Lenders, and USA Debt Consolidation Service; VISION MEDIA LIMITED CORP., a Common-wealth of Dominica Corporation, also dba Optin Global, Inc., USA Lenders Network, USA Lenders, and USA Debt Consolidation Service; RICK YANG, also known as Qing Kuang Yang, aka Calvin Ho, individually, and as principal and owner of Vision Media Limited Corp. and Optin Global, Inc.; PEONIE PUI TING CHEN, individually, and as president of Optin Global, Inc.; ESTELA MARIE RICHIE, aka Stela; JOHN TERRENCE DORLAND, aka Terry; CHRIS VALLEY; BRUCE LERNER; MICHAEL GARCIA; and FRANCIS PRASAD all as individuals; MICHAEL CUERVO, dba NORTHSTAR FINANCIAL, an unknown entity; NORTH COUNTY LOANS, INC. a California corporation; NATIONAL FIDELITY FUNDING, an Indiana corporation; STATESIDE MORTGAGE, INC., a California corporation; AMERICAN HOME EQUITY CORPORATION, a Delaware corporation; QUICKEN LOANS**

1    **INC., a Michigan corporation; AEGIS LENDING CORPORATION, a Delaware corporation;**

2    **EFG FIRST, INC., a California corporation;  and DOES ONE through FIFTY, inclusive,**

3    and alleges violations of **CAN-SPAM Act, 15 U.S.C. §7704(a) and (b)**, **California Business**

4    **and Professions Code §17529.5(a)**, and common law **Civil Conspiracy under California**

5    **Law** and requests injunctive relief, liquidated damages, statutory damages, aggravated

6    damages, and attorney fees authorized as remedies under **15 U.S.C. §7706(g)** and **California**

7    **Business and Professions Code §17529.5 (b)(1)(B)**.

8    <u>**JURISDICTION AND VENUE**</u>

9    1.    This Court has original jurisdiction of this action pursuant to **28 U.S.C. § 1331** for

10    violations of the **CAN-SPAM Act of 2003 (15 U.S.C. §§ 7701 et seq.)**.   This Court also has

11    original jurisdiction under **15 U.S.C. § 7706(g)(1)** for cases involving a civil action by an

12    **internet access provider** adversely affected by a violation of section **15 U.S.C. § 7704(a)(1),**

13    **15 U.S.C. § 7704(b), or 15 U.S.C. § 7704(d)**, or a pattern or practice that violates paragraph

14    **(2), (3), (4), or (5) of section 15 U.S.C. § 7704(a).**   Pursuant to pendent jurisdiction, attendant

15    and related causes of action, arising from the same facts, are also brought under California

16    law, including, but not limited to, violations of **California Business & Professions Code §**

17    **17529.5**.

18    2.    Venue is proper in this Court pursuant to **28 U.S.C. § 1391(b)** and is founded on

19    the fact that a substantial part of the unlawful actions of the defendants occurred in this judicial

20    district.

21    **FACTUAL ALLEGATIONS**

22    3.    Plaintiff is informed and believes and therefore alleges that Defendant **Optin**

23    **Global, Inc.,** also doing business as Vision Media Limited Corp., USA Lenders Network, USA

24    Lenders, and USA Debt Consolidation Service ("**OPTIN GLOBAL**"), is a Delaware Corporation

25    registered as a foreign corporation in California with its principal place of business located at

26    6466 Livia Avenue, Temple City, California, 91780.  Plaintiff is informed and believes and

27    therefore alleges that **OPTIN GLOBAL** has formulated, directed, controlled, or participated in

28    the acts or practices set forth in this complaint.

4.      Plaintiff is informed and believes and therefore alleges that Defendant **Vision Media Limited Corp.,** also doing business as Optin Global, USA Lenders Network, USA Lenders, and USA Debt Consolidation Service ("**VISION MEDIA**"), is a Commonwealth of Dominica corporation with its mailing address of 8 Copthall, P.O. Box 2331, Roseau, St. George, 00152, Commonwealth of Dominica. Plaintiff is informed and believes and therefore alleges that **VISION MEDIA** has formulated, directed, controlled, or participated in the acts or practices set forth in this complaint.  **VISION MEDIA** transacts or has transacted business in the Northern District of California and elsewhere**.**

5.      Plaintiff is informed and believes and therefore alleges that Defendant **Rick Yang**, also known as Calvin Ho, also known as Qing Kuang Yang, ("**YANG**"), is a principal and owner of **OPTIN GLOBAL** and **VISION MEDIA**. Plaintiff is informed and believes and therefore alleges that **Rick Yang** has formulated, directed, controlled, or participated in the acts or practices set forth in this complaint. In connection with matters alleged herein, **YANG** has transacted business in Northern District of California.

6.      Plaintiff is informed and believes and therefore alleges that Defendant **Peonie Pui Ting Chen** ("**CHEN**") is the president of **OPTIN GLOBAL**. Plaintiff is informed and believes and therefore alleges that **Peonie Pui Ting Chen** has formulated, directed, controlled, or participated in the acts or practices set forth in this complaint. In connection with matters alleged herein, **CHEN** has transacted business in the Northern District of California.

7.      Plaintiff is informed and believes and therefore alleges that Defendants **OPTIN GLOBAL, VISION MEDIA, YANG**, and **CHEN** have operated as a common business enterprise in commission of the violations of the *CAN-SPAM Act*, and §17529.5 of the *California Business and Professions Code*.

8.      **OPTIN GLOBAL, VISION MEDIA, YANG, and CHEN** are hereinafter referred to jointly in this complaint as the "**SPAMMERS**."

9.      Plaintiff is informed and believes and therefore alleges that Defendants **ESTELA MARIE RICHIE, also known as Stela; NORTH COUNTY LOANS, INC.; JOHN TERRENCE DORLAND, also known as Terry; MICHAEL CUERVO dba NORTHSTAR FINANCIAL;**

CHRIS VALLEY; NATIONAL FIDELITY FUNDING; BRUCE LERNER; STATESIDE MORTGAGE, INC.; MICHAEL GARCIA; AMERICAN HOME EQUITY CORPORATION; QUICKEN LOANS INC.; EMERALD HOME LOAN, INC.; FRANCIS PRASAD; AEGIS LENDING CORPORATION; and EFG FIRST, INC., are **mortgage brokers, loan officers and or companies** acting as mortgage brokers doing business in the United States and are hereinafter jointly referred to in this complaint as the **"MORTGAGE BROKERS"**.

10.    Plaintiff is informed and believes and therefore alleges that **MORTGAGE BROKERS** conspired with and at all times supported the **SPAMMERS** in execution of the allegations set forth in this complaint.

11.    Plaintiff is informed and believes and therefore alleges that **MORTGAGE BROKERS** knew at all times that **SPAMMERS** were violating the *CAN-SPAM Act*, and *California Business and Professions Code* § 17529.5 resulting in injury to Plaintiff by their fraudulent email attacks.

12.    Plaintiff is informed and believes and therefore alleges that **MORTGAGE BROKERS** have benefited financially and will continue to benefit from their conspiratorial relationship with **SPAMMERS** and as a result will continue to support the illegal and tortuous actions of **SPAMMERS** resulting in injury to Plaintiff.

13.    **OPTIN GLOBAL; VISION MEDIA; YANG, CHEN**; **ESTELA MARIE RICHIE, also known as Stela; NORTH COUNTY LOANS, INC.; JOHN TERRENCE DORLAND, also known as Terry; MICHAEL CUERVO dba NORTHSTAR FINANCIAL; CHRIS VALLEY; NATIONAL FIDELITY FUNDING; BRUCE LERNER; STATESIDE MORTGAGE, INC.; MICHAEL GARCIA; AMERICAN HOME EQUITY CORPORATION; QUICKEN LOANS INC.; EMERALD HOME LOAN, INC.; FRANCIS PRASAD; AEGIS LENDING CORPORATION; and EFG FIRST, INC., and DOES ONE through FIFTY, inclusive,** are referred to jointly in this complaint as the "**Defendants**."

14.    Plaintiff **ASIS INTERNET SERVICES (hereinafter "ASIS")** does not know the true names and capacities of Defendants **OPTIN GLOBAL; VISION MEDIA; YANG, CHEN**; **ESTELA MARIE RICHIE; NORTH COUNTY LOANS, INC.; JOHN TERRENCE DORLAND;**

1  **MICHAEL CUERVO dba NORTHSTAR FINANCIAL; CHRIS VALLEY; NATIONAL FIDELITY**

2  **FUNDING; BRUCE LERNER; STATESIDE MORTGAGE, INC.; MICHAEL GARCIA;**

3  **AMERICAN HOME EQUITY CORPORATION; QUICKEN LOANS INC.; EMERALD HOME**

4  **LOAN, INC.; FRANCIS PRASAD; AEGIS LENDING CORPORATION; and EFG FIRST, INC.,**

5  **and DOES ONE through FIFTY, inclusive**, their business capacities, their ownership

6  connection to the business(s), nor their relative responsibilities in causing the **CAN-SPAM Act**

7  **of 2003** and other violations herein complained of, and alleges a joint venture and common

8  enterprise by all such defendants.   Plaintiff is informed and believes that each of the

9  defendants herein, including DOES ONE to FIFTY, inclusive, is the agent, ostensible agent,

10  master, servant, employer, employee, representative, franchiser, franchisee, joint venture,

11  partner, and associate, or such similar capacity, of each of the other defendants, and was at all

12  times acting and performing, or failing to act or perform, with the authorization, consent,

13  permission or ratification of each of the other defendants, and is responsible in some manner

14  for the acts and omissions of the other defendants in legally causing the violations and

15  damages complained of herein, and have approved or ratified each of the acts or omissions of

16  each other defendant, as herein described.   Plaintiff will seek leave to amend this Complaint

17  when the true names, capacities, connections and responsibilities of defendants are

18  ascertained.

19  15.   Plaintiff is informed and believes that all named defendants, including **DOES**

20  **ONE to FIFTY, inclusive**, conspired to commit the acts described herein, or alternatively,

21  aided and abetted one another in the performance of the wrongful acts hereinafter alleged.

22  16.   Plaintiff **ASIS** is a corporation doing business as **ASIS Internet Services**, is

23  located in Garberville, California, and provides Internet access service within the meaning of

24  *15 U.S.C. § 7702(11)*.

25  17.   Plaintiff alleges that Defendants sent or caused to have sent **in excess of 10,000**

26  deceptive and unsolicited commercial electronic mail messages from **October 25, 2005**,

27  through **November 14, 2005**, to Plaintiff's server, a protected computer.

28  18.   Plaintiff alleges that Defendants transmitted **in excess of 10,000** e-mail

1 advertisements containing and accompanied by falsified, misrepresented, or forged header

2 information.

3     19.    Plaintiff alleges that Defendants transmitted **in excess of 10,000** e-mail

4 advertisements with a subject line that a person would know would be likely to mislead a

5 recipient, acting reasonably under the circumstances, about a material fact regarding the

6 contents and subject matter of the message.

7     20.    Plaintiff alleges that Defendants transmitted, to a protected computer, **in excess**

8 **of 10,000** commercial electronic mail messages, a transactional and relationship message,

9 that contains, or was accompanied by, header information that is materially false or materially

10 misleading.

11     21.    Plaintiff alleges that Defendants initiated the transmission of **in excess of 10,000**

12 commercial electronic mail message to a protected computer without a  clear and conspicuous

13 identification that the message was an advertisement or solicitation.

14     22.    Plaintiff alleges that Defendants used a harvest and directory attack or used an

15 automated creation of multiple email accounts to send **in excess of 10,000** commercial

16 electronic mail message to a protected computer.

17 **FIRST CAUSE OF ACTION**

18 (**Violation of CAN-SPAM Act of 2003 – 15 *U.S.C.* §7704(a)(1), (2),**

19 **(3), and (5) and 15 *U.S.C.* §7704(b)(1) and (2))**

20     23.    Plaintiff refers to the allegations of the preceding paragraphs of this complaint,

21 and incorporates the same herein by this reference as though set forth in full.

22     24.    On **October 25, 2005**, through **November 14, 2005**, Plaintiff received **in excess**

23 **of 10,000** commercial electronic mail messages from defendants to its mail server located in

24 California that violated the ***CAN-SPAM Act of 2003***.

25     25.    Plaintiff alleges that all of the relevant electronic mails sent by the Defendants on

26 **October 25, 2005**, through **November 14, 2005,** contained or were accompanied by header

27 information that was materially false or materially misleading.  Each of these **in excess of**

28 **10,000** initial messages indicated that they were from individuals and various other unknown

1   identities.  Plaintiff alleges that all of the relevant electronic mails were from defendants using

2   stolen or hijacked email identities.   Therefore, the electronic mail violated **15 *U.S.C.***

3   **§7704(a)(1)(A)**.

4         26.   Plaintiff further alleges that the Defendants sent **in excess of 10,000** separate

5   items of electronic mail to plaintiff's computer that include various domain names, such as

6   **wwmort.com, b3mort.com, vcmort.com, great-3.com** and others**,** which were registered to

7   unknown and false entities**.**  Said conduct was in violation of **15 *U.S.C.* §7704(a)(1)(A)**.

8         27.   Plaintiff further alleges that it received hundreds of separate items of electronic

9   mail from Defendants to email addresses that had not existed for the prior year and had not

10   requested or agreed to accept any solicitations.

11         28.   Plaintiff further alleges that the Defendants sent **in excess of 10,000** separate

12   items of electronic mail to Plaintiff's computer that were acquired as the result of a directory

13   harvest.  Said conduct was in violation of **15 *U.S.C.* §7704(b)(1)**.

14         29.   Plaintiff further alleges that the defendants sent **in excess of 10,000** separate

15   items of electronic mail to the plaintiff from addresses acquired by the use of automated tools

16   or scripts.  Said conduct was in violation of **15 *U.S.C.* §7704(b)(2)**.

17         30.   As a proximate result of said unlawful conduct by said Defendants, plaintiff is

18   entitled to statutory damages in the amount of up to $100.00 per email in the case of violation

19   of **15 *U.S.C.* §7704(a)(1)** and up to $25.00 per email in the case of each violation of

20   subsections **15 *U.S.C.* §7704(a)(2), (3),** and **(5)** in the form of statutory damages as set forth in

21   **15 *U.S.C.* §7706(g)(1)(B)(ii) and (3)(A)(i)** and **(ii)**.

22         31.   As a proximate result of said unlawful conduct by said Defendants, plaintiff is

23   entitled to treble statutory damages as a result of violation of any section of **15 *U.S.C.***

24   **§7704(b)** as set forth in **15 *U.S.C.* §7706(g)(1)(C)**.

25         32.   Plaintiff furthermore seeks a preliminary and permanent injunction against the

26   defendants for their current and future violations of the ***CAN-SPAM Act of 2003*** as it and

27   members of the general public will continue to incur damages as a result of the unlawful

28   conduct of said Defendants.  The seeking of injunctive relief by the plaintiff is specifically

1   authorized by **15 *U.S.C.* §7706(g)(1)(A)**.

2       33.    Plaintiff furthermore seeks its attorney fees and costs against the Defendants

3   pursuant to **15 *U.S.C.* §7706(g)(4)**.

4                                            **SECOND CAUSE OF ACTION**

5                **(Violation of *California Business and Professions Code* §17529.5**

6                **Unlawful activities relating to commercial email advertisements.)**

7       34.    Plaintiff hereby incorporates by reference paragraphs 1 through 33, inclusive, as

8   if the same were fully set forth herein.

9       35.    Plaintiff alleges that all of the relevant electronic mails sent by the Defendants on

10  **October 25, 2005**, through **November 14, 2005**, contained or were accompanied by header

11  information that was materially false or materially misleading.  Each of these **in excess of**

12  **10,000** initial messages indicated that they were from individuals and various other unknown

13  identities.   Plaintiff alleges that all of the relevant electronic mails were from defendants using

14  stolen or hijacked email identities.  Therefore, the electronic mail violated ***California Business***

15  ***and Professions Code* § 17529.5(a)(2)**.

16      36.    Plaintiff further alleges that the Defendants sent **in excess of 10,000** separate

17  items of electronic mail plaintiff's computer that include various subject lines that were false

18  and misleading and would be likely to mislead a recipient, acting reasonably under the

19  circumstances, about a material fact regarding the contents or subject matter of the message

20  in violation of ***California Business and Professions Code* § 17529.5(a)(3)**.

21      37.    As a proximate result of said unlawful conduct by said Defendants, Plaintiff is

22  entitled to liquidated damages in the amount of $1,000.00 for each unsolicited commercial

23  email transmitted in violation of ***California Business and Professions Code* § 17529.5(a)** as

24  set forth in ***California Business and Professions Code §* 17529.5(b)(1)(B)(ii)**.

25      38.    Plaintiff furthermore seeks its attorney fees and costs against the defendants

26  pursuant to ***California Business and Professions Code* §17529.5(b)(1)(C)**.

27  ///

28  ///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    9

**THIRD CAUSE OF ACTION**

(**Violation of California common law Civil Conspiracy**)

39.  Plaintiff hereby incorporates by reference paragraphs 1 through 38, inclusive, as if the same were fully set forth herein.

40.  Plaintiff alleges that **MORTGAGE BROKERS** knew the **SPAMMERS'** conduct constituted a breach of duty to Plaintiff and gave substantial assistance or encouragement to the **SPAMMERS** so as to injure Plaintiff by violating the ***CAN-SPAM Act*** and ***California Business and Professions Code § 17529.5***.

41.  Plaintiff alleges that **MORTGAGE BROKERS** knew before, during, and after each violation that **SPAMMERS** were injuring Plaintiff by **SPAMMERS'** violations of the ***CAN-SPAM Act*** and ***California Business and Professions Code § 17529.5***.

42.  Plaintiff alleges that Defendants' violation of the ***CAN-SPAM Act*** and ***California Business and Professions Code § 17529.5*** has resulted in injury to Plaintiff in the form of lost revenue, increased cost of services to Plaintiff's customers, illegal use of Plaintiff's equipment and services, and other forms of injury to be named.

43.  Plaintiff alleges that the **MORTGAGE BROKERS** are members of the loan officer and mortgage broker industry and as such are aware of and have been informed through readily available industry news sources that list providers may use illegal spamming techniques to gather sales leads and sell them to loan officers and mortgage brokers.

44.  Plaintiff alleges that the **MORTGAGE BROKERS** contacted citizens of California via names and contact information provided by **SPAMMERS.**

45.  Plaintiff alleges that **MORTGAGE BROKERS** were informed and knew prior to conspiring with **SPAMMERS** that **SPAMMERS** had been named in a federal prosecution for violations of the ***CAN-SPAM Act*** and ***California Business and Professions Code § 17529.5*** and that **SPAMMERS** are under a federal judicial injunction not to pursue spamming activities**.**

46.  Plaintiff seeks statutory and liquidated damages for violations of the ***CAN-SPAM Act*** and ***California Business and Professions Code § 17529.5*** from each and all of the Defendant conspirators.

47.     Plaintiff seeks damages for its losses as to be determined by proof.

48.     Plaintiff furthermore seeks its attorney fees and costs against the Defendants.

49.     Plaintiff seeks further relief as this Courts deems just and proper.

**WHEREFORE**, plaintiff prays judgment against the Defendants and each of them as follows:

1.      For statutory damages of up to $100.00 for each violation of **15 *U.S.C.* §7704(a)(1)** and up to $25.00 in the case of violations of **§ 7704(a)(2), (3) and (5)** in the sum of $1,000,000;

2.      For aggravated damages under **15 *U.S.C.* §7706(g)(1)(C)** of up to three times the amount above for these violations committed by the defendants' violations of **15 *U.S.C.* §7704(b)**;

3.      For a preliminary and permanent injunction preventing the defendants and all persons acting in concert with them from the violation of the ***Can-Spam Act of 2003***;

4.      For liquidated damages of $1,000.00 for each violation of ***California Business and Professions Code* § 17529.5(a)** in the sum of $1,000,000;

4.      For an award of reasonable attorneys' fees and costs according to proof;

5.      For costs of suit; and

6.      For such other and further relief as this Court deems just and proper.

                                                    **SINGLETON LAW GROUP**

Dated:        November 30, 2005        _____

                                                    Jason K. Singleton, Attorneys for Plaintiff,
                                                    **ASIS INTERNET SERVICES**

### REQUEST FOR JURY TRIAL

Plaintiff hereby requests a jury for all claims for which a jury is permitted.

                                                    **SINGLETON LAW GROUP**

Dated:        November 30, 2005        _____

                                                    Jason K. Singleton, Attorneys for Plaintiff,
                                                    **ASIS INTERNET SERVICES**

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF        11

Exhibit C

**Jason K. Singleton**, **State Bar #166170**
**lawgroup@sbcglobal.net**
**Richard E. Grabowski**, **State Bar #236207**
**rgrabows@pacbell.net**
**SINGLETON LAW GROUP**
**611 "L" Street, Suite A**
**Eureka, CA 95501**
**(707) 441-1177**
**FAX  441-1533**

**Attorneys for Plaintiff, ASIS INTERNET SERVICES**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASIS INTERNET SERVICES, a California corporation,** )<br><br>　　　**Plaintiff,** )<br><br>**vs.** )<br><br>**VALUECLICK, INC., dba VC E-COMMERCE SOLUTIONS, INC., also dba CONSUMERINCENTIVEZONE.COM, also dba PROMOTIONSGATEWAY.COM, also dba GENEROUSGENIE.COM, also dba REWARDSGATEWAY.COM, also dba CONSUMERPROMOTIONCENTER.COM, also dba REWARDAMAZON.COM, also dba GIVEAWAYCAFE.COM and DOES ONE through FIFTY, inclusive,** )<br><br>　　　**Defendants.** )<br>_____ ) | **Case No. C-07-3261 EMC**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – VIOLATION OF CAN-SPAM ACT OF 2003 [15 *U.S.C.* § 7701,  *et seq.*] AND CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17529.5**<br><br>**DEMAND FOR JURY TRIAL** |

　　　**Plaintiff, ASIS INTERNET SERVICES, a California corporation,** and an Internet Access Provider**,** complains of Defendants **VALUECLICK, INC., dba VC E-COMMERCE SOLUTIONS, INC., also dba CONSUMERINCENTIVEZONE.COM, also dba PROMOTIONSGATEWAY.COM, also dba GENEROUSGENIE.COM, also dba REWARDSGATEWAY.COM, also dba CONSUMERPROMOTIONCENTER.COM, also dba REWARDAMAZON.COM, also dba GIVEAWAYCAFE.COM, and DOES ONE through FIFTY, inclusive** and alleges violations of ***CAN-SPAM Act,* 15 *U.S.C.* § 7704(a) and (b)**  and

1  *California Business and Professions Code* **§ 17529.5(a)** and requests injunctive relief,

2  liquidated damages, statutory damages, aggravated damages, and attorney fees authorized as

3  remedies under **15 *U.S.C.* § 7706(g)** and *California Business and Professions Code* **§

4  17529.5(b)(1)(B)**.

5  <u>**JURISDICTION AND VENUE**</u>

6      1.    This Court has original jurisdiction of this action pursuant to **28 *U.S.C.* § 1331** for

7  violations of the ***CAN-SPAM Act of 2003*** **(15 *U.S.C.* §§ 7701 et seq.)**. This Court also has

8  original jurisdiction under **15 *U.S.C.* § 7706(g)(1)** for cases involving a civil action by an

9  **internet access provider** adversely affected by a violation of section **15 *U.S.C.* § 7704(a)(1),**

10 **15 *U.S.C.* § 7704(b), or 15 *U.S.C.* § 7704(d)**, or a pattern or practice that violates paragraphs

11 **(2), (3), (4), or (5) of section 15 *U.S.C.* § 7704(a).** Pursuant to pendent jurisdiction, attendant

12 and related causes of action, arising from the same facts, are also brought under California

13 law, including, but not limited to, violations of *California Business & Professions Code* **§

14 17529.5**.

15     2.    This Court has personal jurisdiction over Defendants **VALUECLICK, INC.,** who

16 maintain offices at 30699 Russell Ranch Road, Suite 250, Westlake Village, CA 91362, and

17 **VC E-COMMERCE SOLUTIONS, INC.,** who maintain offices at 15360 Ventura Blvd., Suite

18 1750, Los Angeles, CA 91403, according to representations made to the Secretary of State of

19 California. **VC E-COMMERCE SOLUTIONS, INC.,** is listed by the Secretary of State of

20 California as a suspended corporation**.** The Secretary of State of California also lists agents

21 for service for **VALUECLICK, INC.,** and **VC E-COMMERCE SOLUTIONS, INC.,** in California.

22 The other **dba's** named in this suit are copyrighted names owned by **VC E-COMMERCE

23 SOLUTIONS, INC.** Therefore, the court has personal jurisdiction pursuant to physical

24 presence of the Defendant within the court's territorial jurisdiction. ***Burnham v. Sup.Ct.***, 495

25 US at 610–611, (1990).

26     3.    Venue is proper in this Court pursuant to **28 *U.S.C.* § 1391(b)** and is founded on

27 the fact that a substantial part of the unlawful actions of the defendants occurred in this judicial

28 district.

**FACTUAL ALLEGATIONS**

3.     Plaintiff is informed and believes and therefore alleges that Defendant **VALUECLICK, INC.,** is a Delaware Corporation registered with the Secretary of State of California to do business in California with agent for service in California.  (see Exhibit "A"). Plaintiff is informed and believes and therefore alleges that Defendant **VALUECLICK, INC.,** is the sole owner of **VC E-COMMERCE SOLUTIONS, INC.,** a defunct California corporation whose status is listed by the Secretary of State of California as "suspended".  (See Exhibit "B"). Plaintiff is informed and believes and therefore alleges that Defendant **VALUECLICK, INC.** is the successor in interest to the defunct corporation **VC E-COMMERCE SOLUTIONS, INC.** Defendant **VALUECLICK, INC.,** is believed to be a corporation or the agent of a corporation or partnership providing internet marketing services to retailers selling to residents of the United States and California over the internet.

4.     Plaintiff is informed and believes and therefore alleges that Defendants **CONSUMERINCENTIVEZONE.COM, PROMOTIONSGATEWAY.COM, GENEROUSGENIE.COM, REWARDSGATEWAY.COM, CONSUMERPROMOTIONCENTER.COM, REWARDAMAZON.COM, and GIVEAWAYCAFE.COM** are aliases or agents for Defendants **VALUECLICK, INC.,** and or **VC E-COMMERCE SOLUTIONS, INC.**   (See Exhibit "C" – see Para. 17 of each set of Terms and Conditions describing ownership of each program name and declaring the name as a trademark of **VC E-COMMERCE SOLUTIONS, INC.**).

5.     Plaintiff **ASIS INTERNET SERVICES (hereafter  "ASIS)** does not know the true names and capacities of defendants **VALUECLICK, INC., dba VC E-COMMERCE SOLUTIONS, INC., also dba CONSUMERINCENTIVEZONE.COM, also dba PROMOTIONSGATEWAY.COM, also dba GENEROUSGENIE.COM, also dba REWARDSGATEWAY.COM, also dba CONSUMERPROMOTIONCENTER.COM, also dba REWARDAMAZON.COM, also dba GIVEAWAYCAFE.COM, and DOES ONE to FIFTY, inclusive**, their business capacities, their ownership connection to the business(s), nor their relative responsibilities in causing the *CAN-SPAM Act of 2003* and other violations herein complained of, and alleges a joint venture and common enterprise by all such defendants.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF       3

Plaintiff is informed and believes that each of the defendants herein, including DOES ONE to FIFTY, inclusive, is the agent, ostensible agent, master, servant, employer, employee, representative, franchiser, franchisee, joint venturer, partner, and associate, or such similar capacity, of each of the other defendants, and was at all times acting and performing, or failing to act or perform, with the authorization, consent, permission or ratification of each of the other defendants, and is responsible in some manner for the acts and omissions of the other defendants in legally causing the violations and damages complained of herein, and have approved or ratified each of the acts or omissions of each other defendant, as herein described. Plaintiff will seek leave to amend this Complaint when the true names, capacities, connections and responsibilities of defendants **VALUECLICK, INC., dba VC E-COMMERCE SOLUTIONS, INC., also dba CONSUMERINCENTIVEZONE.COM, also dba PROMOTIONSGATEWAY.COM, also dba GENEROUSGENIE.COM, also dba REWARDSGATEWAY.COM, also dba CONSUMERPROMOTIONCENTER.COM, also dba REWARDAMAZON.COM, also dba GIVEAWAYCAFE.COM, and DOES ONE to FIFTY, inclusive**, are ascertained.

6. Plaintiff is informed and believes that all named defendants, including **DOES ONE to FIFTY, inclusive**, conspired to commit the acts described herein, or alternatively, aided and abetted one another in the performance of the wrongful acts hereinafter alleged.

7. Plaintiff **ASIS** is a California corporation registered to do business in California and is located in Garberville, California. **ASIS** provides Internet access service within the meaning of **15 *U.S.C.* § 7702(11)**.

8. Plaintiff alleges that Defendants sent or caused to have sent **5624** commercial electronic mail messages from **October 25, 2005, through March 30, 2007**, to Plaintiff's server, a protected computer, containing, and/or accompanied by, header information that was materially false or materially misleading.

9. Plaintiff states that the email accounts that the **5624** commercial emails were sent to did not solicit the emails. These emails were unsolicited because they were sent to unassigned or inactive email accounts owned by **ASIS**. **ASIS** did not solicit any product,

1 service, or information from any entity using these email accounts.

2      10.     Plaintiff alleges that Defendants transmitted **5624** unsolicited commercial
3 electronic mail messages with a subject line that a person would know would be likely to
4 mislead a recipient, acting reasonably under the circumstances, about a material fact
5 regarding the contents and subject matter of the message.

6      11.     Plaintiff alleges that Defendants sent or caused to have sent **5624** unsolicited e-
7 mail advertisements containing and/or accompanied by falsified, misrepresented, or forged
8 header information.

9      12.     Plaintiff alleges that Defendants transmitted **5624** unsolicited e-mail
10 advertisements with a subject line that a person would know would be likely to mislead a
11 recipient, acting reasonably under the circumstances, about a material fact regarding the
12 contents and subject matter of the message.

13      13.     Plaintiff alleges that Defendants used a harvest and directory attack to acquire
14 Plaintiff's and Plaintiff's customers email accounts to send **5624** commercial electronic mail
15 messages to a Plaintiff's protected computer.  Many of the email accounts receiving the emails
16 have not been in-active for several years.

17      14.     Plaintiff alleges that Defendants used an automated creation of multiple email
18 accounts to send **5624** commercial electronic mail messages to a Plaintiff's protected
19 computer.

20      15.     Plaintiff alleges that Defendants used a protected computer/network without
21 authorization to relay or retransmit the **5624** commercial electronic mail messages to Plaintiff's
22 protected computer.

### FIRST CAUSE OF ACTION
23
(**Violation of CAN-SPAM Act of 2003 – 15 *U.S.C.* §7704(a)(1) and (2),
24 and 15 *U.S.C.* §7704(b)(1) and (2))**

25      16.     Plaintiff refers to the allegations of the preceding paragraphs of this complaint,
26 and incorporates the same herein by this reference as though set forth in full.

27      17.     On **October 25, 2005, through March 30, 2007**, Plaintiff received **5624**
28 commercial electronic mail messages from defendants to its mail server located in California

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    5

1 | that violated the **CAN-SPAM Act of 2003**.

2 |     18.    Plaintiff alleges that all of the relevant electronic mails sent by the Defendants on

3 | **October 25, 2005, through March 30, 2007**, contained or were accompanied by header

4 | information that was materially false or materially misleading.  Each of these **5624** messages

5 | indicated that they were from email accounts such as "CustomerService", "Blue Light Special",

6 | "ShippingDept", or various other unknown identities.  These false email names resolved into

7 | emails sent by various person or persons unknown (e,g, CustomerService to

8 | CustomerService@90.cityain.com,  Blue Light Special to BlueLight@146.tryeway.com,

9 | and ShippingDept to ShippingDept@242.sumnic.com).  See sample emails and source

10 | code in Exhibit "D" attached hereto.  (Note that all receiving email accounts have been

11 | redacted, while these email all represent inactive email accounts they are still the property of

12 | **ASIS Internet Services** and are protected by ASIS's corporate privilege.)  A WHOIS check of

13 | the domain name registration for **cityain.com** indicates that the domain name was registered

14 | under a protection service.  The true registrant for **cityain.com** cannot be determined without a

15 | subpoena.  See Exhibit "E" attached hereto.  A lookup for the underlying server indicated in the

16 | IP Address for **tryeway.com** indicates that it cannot be determined, this usually indicates

17 | that the domain name is not properly registered or was registered under a domain name

18 | privacy or proxy service.  The true registrant for **tryeway.com** cannot be determined without

19 | a subpoena and possibly not at all.   A WHOIS check of the domain name registration for

20 | **sumnic.com** indicates it is registered  under a protection service., Inc. a privacy service that

21 | conceals the true registrants identity.  See Exhibit "F."  The true identity of **sumnic.com** can

22 | only be determined by subpoena.  See Exhibit "G."  Plaintiff has reviewed the Domain Name

23 | registration for all of the sending Domain Names and determined that a majority of the emails

24 | were sent using email accounts registered to domain names that are registered under services

25 | that conceal the true identity of the domain name registrant through a proxy service or privacy

26 | service.  See a sample of the WHOIS reports reviewed in Exhibit "H".  Also see examples of

27 | domain name privacy/proxy service advertisements in Exhibit "K".  Some of the proxy/privacy

28 | services used boast that they do not even collect identification information and accept

anonymous cash payments.  Plaintiff has been unable to identify any of the remaining domain name registrants as real persons or entities.  **15 *U.S.C.* §7704(a)(1)(A)** states:

> "(A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading.

**15 *U.S.C.* §7704(a)(6)** states:

> "the term "materially", when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation…"

Therefore, since false information was used to generate the domain names and/or domain names were concealed from investigation through proxy/privacy services the electronic mail messages violated **15 *U.S.C.* §7704(a)(1)(A)**.

19.    Plaintiff further alleges that the Defendants sent **5624** separate items of electronic mail to Plaintiff's computer that include advertisements with a subject line that a person would know would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents and subject matter of the message. **15 *U.S.C.* § 7704(a)(2)(1)** defines two methods for determining if a subject line is misleading: 1) if such person has actual knowledge"; or 2) "knowledge fairly implied on the basis of objective circumstances."  Plaintiff alleges that the "circumstances" required are plainly visible in the actual subject lines of the emails.  The email subject lines received by Plaintiff were clearly intended to get someone to open the email by enticing them with free gifts such as: "$1500 Visa Gift Card on us"; " Joan, Let us pay for a trip to Las Vegas!"; and "All expense paid trip to Chicago to see the show you love!".  See Exhibit "I."  (Note that all receiving email accounts have been redacted, while these email all represent inactive email accounts they are still the property of **ASIS Internet Services** and are protected by ASIS's corporate privilege.) These subject lines are provided as examples, various other similar subject lines were

included in the emails.

20. Plaintiff further alleges that the Defendants sent **5624** separate items of electronic mail to plaintiff's computer that include statements in the body of the emails stating that they are email messages from **CONSUMERINCENTIVEZONE.COM, PROMOTIONSGATEWAY.COM, GENEROUSGENIE.COM, REWARDSGATEWAY.COM, CONSUMERPROMOTIONCENTER.COM, REWARDAMAZON.COM, and GIVEAWAYCAFE.COM**.  Uniform Resource Locators (hereafter URLs) contained in the emails directed the recipient to websites of **CONSUMERINCENTIVEZONE.COM, PROMOTIONSGATEWAY.COM, GENEROUSGENIE.COM, REWARDSGATEWAY.COM, CONSUMERPROMOTIONCENTER.COM, REWARDAMAZON.COM, and GIVEAWAYCAFE.COM**.  Plaintiff alleges that these entities, trademarks, and websites are owned by **VC E-COMMERCE SOLUTIONS, INC.,** and their successor corporation **VALUECLICK, INC.**

21. Plaintiff alleges that **VC E-COMMERCE SOLUTIONS, INC.,** is a wholly owned subsidiary of **VALUECLICK, INC.,** and **VALUECLICK, INC.,** is the successor corporation to **VC E-COMMERCE SOLUTIONS, INC.**   See Exhibit  "J" – SEC 10K Subsidiary Registrant Report Ex. 21.1.

22. Plaintiff further alleges that it received thousands of separate items of electronic mail from the Defendants to email addresses that had not existed for the prior year and had not requested or agreed to accept any solicitations.

23. Plaintiff further alleges that the Defendants sent or had sent **5624** separate items of electronic mail to Plaintiff's computer that were acquired as the result of a directory harvest. Said conduct was in violation of **15 *U.S.C.* §7704(b)(1)**.

24. Plaintiff further alleges that the defendants sent or had sent **5624** separate items of electronic mail to the plaintiff, from addresses that were acquired by the use of automated tools or scripts.  Said conduct was in violation of **15 *U.S.C.* §7704(b)(2)**.

25. Plaintiff further alleges that Defendants used or had used a protected computer/network without authorization to relay or retransmit the **5624** commercial electronic

1 | mail messages sent to Plaintiff's protected computer.

2 |     26.    As a proximate result of said unlawful conduct by said Defendants, Plaintiff is

3 | entitled to statutory damages in the amount of up to $100.00 per email in the case of violation

4 | of **15 *U.S.C.* §7704(a)(1)** and up to $25.00 per email in the case of each violation of

5 | subsections **15 *U.S.C.* §7704(a)(2)** in the form of statutory damages as set forth in **15 *U.S.C.***

6 | **§7706(g)(1)(B)(ii) and (3)(A)(i)** and **(ii)**.

7 |     27.    As a proximate result of said unlawful conduct by said defendants, Plaintiff is

8 | entitled to treble all statutory damages as a result of violation of any section of **15 *U.S.C.***

9 | **§7704(b)** as set forth in **15 *U.S.C.* §7706(g)(1)(C)**.

10 |     28.    Plaintiff furthermore seeks a preliminary and permanent injunction against the

11 | defendants for their current and future violations of the ***CAN-SPAM Act of 2003*** as Plaintiff

12 | and members of the general public will continue to incur damages as a result of the unlawful

13 | conduct of said defendants.  The seeking of injunctive relief by the plaintiff is specifically

14 | authorized by **15 *U.S.C.* §7706(g)(1)(A)**.

15 |     29.    Plaintiff furthermore seeks its attorney fees and costs against the defendants

16 | pursuant to **15 *U.S.C.* §7706(g)(4)**.

17 | **SECOND CAUSE OF ACTION**

18 | **(Violation of *California Business and Professions Code* §17529.5**
**Unlawful activities relating to commercial email advertisements.)**

19 |     30.    Plaintiff hereby incorporates by reference paragraphs 1 through 29, inclusive, as

20 | if the same were fully set forth herein.

21 |     31.    Plaintiff alleges that all of the relevant electronic mails sent or sent on behalf of

22 | the Defendants on **October 25, 2005, through March 30, 2007**, contained or were

23 | accompanied by header information that was materially false or materially misleading.  Each of

24 | these **5624** unsolicited email advertisements indicated that they were from email accounts

25 | such as "CustomerService", "Blue Light Special", "ShippingDept", or various other unknown

26 | identities.  These false email names resolved into emails sent by various persons or persons

27 | unknown (e,g, CustomerService to CustomerService@90.cityain.com,  Blue Light Special to

28 | BlueLight@146.tryeway.com,  and ShippingDept to ShippingDept@242.sumnic.com).

See sample emails and source code in Exhibit "D" attached hereto.  (Note that all receiving email accounts have been redacted, while these email all represent inactive email accounts they are still the property of **ASIS Internet Services** and are protected by ASIS's corporate privilege.)  A WHOIS check of the domain name registration for **cityain.com** indicates that the domain name was registered under protection service.  The true registrant for **cityain.com** cannot be determined without a subpoena.  See Exhibit "E" attached hereto.  A lookup for the underlying server indicated in the IP Address for **tryeway.com** indicates that it cannot be determined, this usually indicates that the domain name is not properly registered or was registered under a domain name privacy or proxy service.  The true registrant for **tryeway.com** cannot be determined without a subpoena and possibly not at all.   A WHOIS check of the domain name registration for **sumnic.com** indicates it is registered  under a protection service., Inc. a privacy service that conceals the true registrants identity.   See Exhibit "F."   The true identity of **sumnic.com** can only be determined by subpoena.   See Exhibit "G."  Plaintiff has reviewed the Domain Name registration for all of the sending Domain Names and determined that a majority of the emails were sent using email accounts registered to domain names that are registered under services that conceal the true identity of the domain name registrant through a proxy service or privacy service.  See a sample of the WHOIS reports reviewed in Exhibit "H".   Plaintiff has been unable to identify any of the remaining domain name registrants as real persons or entities.  Therefore, the electronic mail violated *California Business and Professions Code* **§ 17529.5(a)(2)**.

32.    Plaintiff further alleges that the Defendants sent or had sent at least **5624** separate unsolicited electronic mail advertisements to plaintiff's computer that include various subject lines that were false and misleading and would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message in violation of ***California Business and Professions Code* § 17529.5(a)(3)**.  Plaintiff alleges that the "circumstances" required are plainly visible in the actual subject lines of the emails.  The email subject lines received by Plaintiff were clearly intended to get someone to open the email by enticing them with free gifts such as: "$1500

1  Visa Gift Card on us"; " Joan, Let us pay for a trip to Las Vegas!"; and "All expense paid trip to
2  Chicago to see the show you love!".  See Exhibit "I."  These subject lines are provided as
3  examples, various other similar subject lines were included in the emails.

4      33.     As a proximate result of said unlawful conduct by said Defendants, Plaintiff is
5  entitled to liquidated damages in the amount of $1,000.00 for each unsolicited commercial
6  email transmitted in violation of *California Business and Professions Code* § 17529.5(a) as
7  set forth in *California Business and Professions Code §* 17529.5(b)(1)(B)(ii).

8      34.     Plaintiff furthermore seeks its attorney fees and costs against the defendants
9  pursuant to *California Business and Professions Code* §17529.5(b)(1)(C).

10     **WHEREFORE**, plaintiff prays judgment against the defendants and each of them as
11 follows:

12     1.     For statutory damages of up to $100.00 for each violation of **15 *U.S.C.***
13 **§7704(a)(1)** and up to $25.00 in the case of violations of **§ 7704(a)(2)** in the sum of **$703,000**;

14     2.     For aggravated damages under **15 *U.S.C.* §7706(g)(1)(C)** of up to three times
15 the amount above for these violations committed by the defendants' violations of **15 *U.S.C.***
16 **§7704(b)** in the sum of **$2,109,000**;

17     3.     For a preliminary and permanent injunction preventing the defendants and all
18 persons acting in concert with them from the violation of the ***Can-Spam Act of 2003***;

19     4.     For liquidated damages of $1000.00 for each violation of ***California Business***
20 ***and Professions Code* § 17529.5(a)** in the sum of **$5,624,000**;

21     4.     For an award of reasonable attorneys' fees and costs according to proof;

22     5.     For costs of suit; and

23     6.     For such other and further relief as this Courts deems just and proper.

24                         **SINGLETON LAW GROUP**

25

26 Dated:     June 13, 2007         _____/s/ Jason K. Singleton_____
                                     Jason K. Singleton
27                                   Richard E. Grabowski,
                                     Attorneys for Plaintiff, **ASIS INTERNET SERVICES**
28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF     11

### REQUEST FOR JURY TRIAL

Plaintiff hereby requests a jury for all claims for which a jury is permitted.

**SINGLETON LAW GROUP**

Dated:       June 13, 2007              _____/s/ Jason K. Singleton_____
Jason K. Singleton
Richard E. Grabowski
Attorneys for Plaintiff, **ASIS INTERNET SERVICES**

Exhibit D

ORIGINAL

**Jason K. Singleton**, State Bar #166170
lawgroup@sbcglobal.net
**Richard E. Grabowski**, State Bar #236207
rgrabows@pacbell.net
**SINGLETON LAW GROUP**
611 "L" Street, Suite A
Eureka, CA 95501
(707) 441-1177
FAX  441-1533

E-filing

FILED

SEP - 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Attorneys for Plaintiff, ASIS INTERNET SERVICES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASIS INTERNET SERVICES**, a California corporation, | Case No. |
| Plaintiff, | C 07 4630 JSW |
| vs. | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – VIOLATION OF CAN-SPAM ACT OF 2003 [15 *U.S.C.* § 7701, *et seq.*] AND CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17529.5** |
| **AZOOGLE.COM, INC.**, a Delaware Corporation dba **AZOOGLEADS US, INC.**, a Delaware Corporation, and **DOES ONE through FIFTY**, inclusive, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff, **ASIS INTERNET SERVICES**, a **California corporation**, and an Internet Access Provider, complains of Defendants **AZOOGLE.COM, INC.**, a Delaware Corporation, dba **AZOOGLEADS US, INC.**, a Delaware Corporation, and **DOES ONE through FIFTY**, **inclusive**, and alleges violations of *CAN-SPAM Act, 15 U.S.C.* § 7704(a), (b), and *California Business and Professions Code* § 17529.5(a) and requests injunctive relief, liquidated damages, statutory damages, aggravated damages, and attorney fees authorized as remedies under **15 *U.S.C.* § 7706(g)** and *California Business and Professions Code* § 17529.5(b)(1)(B).

**JURISDICTION AND VENUE**

1.    This Court has original jurisdiction of this action pursuant to **28 *U.S.C.* § 1331** for violations of the *CAN-SPAM Act of 2003* (**15 *U.S.C.* §§ 7701 et seq.**).    This Court also has

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF      1

1   original jurisdiction under **15 *U.S.C.* § 7706(g)(1)** for cases involving a civil action by an

2   **internet access provider** adversely affected by a violation of section **15 *U.S.C.* § 7704(a)(1,**

3   **15 *U.S.C.* § 7704(b), or 15 *U.S.C.* § 7704(d)**, or a pattern or practice that violates paragraphs

4   **(2), (3), (4), or (5) of section 15 *U.S.C.* § 7704(a).** Pursuant to pendent jurisdiction, attendant

5   and related causes of action, arising from the same facts, are also brought under California

6   law, including, but not limited to, violations of ***California Business & Professions Code §***

7   **17529.5**.

8       2.    This Court has personal jurisdiction over Defendants **AZOOGLE.COM, INC. dba**

9   **AZOOGLEADS US, INC.,** who maintain offices at 1051 East Hillsdale Blvd, Suite 520, Foster

10   City, California, 94404. Therefore, the court has personal jurisdiction pursuant to physical

11   presence of the Defendant within the court's territorial jurisdiction. ***Burnham v. Sup.Ct.***, 495

12   *US* at 610–611, (1990).

13       3.    Venue is proper in this Court pursuant to **28 *U.S.C.* § 1391(b)** and is founded on

14   the fact that a substantial part of the unlawful actions of the defendants occurred in this judicial

15   district.

16                             **FACTUAL ALLEGATIONS**

17       4.    Plaintiff is informed and believes and therefore alleges that Defendant

18   **AZOOGLE.COM, INC.,** is a Delaware Corporation with offices in California. Plaintiff is

19   informed and believes and therefore alleges that Defendant **AZOOGLEADS US, INC.,** is a

20   Delaware Corporation with offices in California. Plaintiff is informed and believes and therefore

21   alleges that Defendant **AZOOGLE.COM, INC.,** is doing business as or is the owner of

22   **AZOOGLEADS US, INC. AZOOGLE.COM, INC. dba AZOOGLEADS US, INC.,** is believed to

23   be a corporation or partnership providing internet marketing services to retailers selling to

24   residents of the United States and California over the internet.

25       5.    Plaintiff **ASIS INTERNET SERVICES (hereafter "ASIS)** does not know the true

26   names and capacities of defendants **AZOOGLE.COM, INC. and AZOOGLEADS US, INC,**

27   their business capacities, their ownership connection to the business(s), nor their relative

28   responsibilities in causing the ***CAN-SPAM Act of 2003*** and other violations herein complained

1   of, and alleges a joint venture and common enterprise by all such defendants.  Plaintiff is

2   informed and believes that each of the defendants herein, including DOES ONE to FIFTY,

3   inclusive, is the agent, ostensible agent, master, servant, employer, employee, representative,

4   franchiser, franchisee, joint venturer, partner, and associate, or such similar capacity, of each

5   of the other defendants, and was at all times acting and performing, or failing to act or perform,

6   with the authorization, consent, permission or ratification of each of the other defendants, and

7   is responsible in some manner for the acts and omissions of the other defendants in legally

8   causing the violations and damages complained of herein, and have approved or ratified each

9   of the acts or omissions of each other defendant, as herein described.  Plaintiff will seek leave

10   to amend this Complaint when the true names, capacities, connections and responsibilities of

11   defendants **AZOOGLE.COM, INC. and AZOOGLEADS US, INC., and DOES ONE to FIFTY,**

12   **inclusive**, are ascertained.

13       6.    Plaintiff is informed and believes that all named defendants, including **DOES**

14   **ONE to FIFTY, inclusive**, conspired to commit the acts described herein, or alternatively,

15   aided and abetted one another in the performance of the wrongful acts hereinafter alleged.

16       7.    Plaintiff **ASIS** is a California corporation registered to do business in California

17   and is located in Garberville, California.  **ASIS** provides Internet access service within the

18   meaning of **15 *U.S.C.* § 7702(11)**.

19       8.    Plaintiff alleges that Defendants sent or caused to have sent **1296** commercial

20   electronic mail messages from **October 25, 2005, through August 14, 2007**, to Plaintiff's

21   server, a protected computer, containing, and/or accompanied by, header information that was

22   materially false or materially misleading.

23       9.    Plaintiff states that the email accounts that the **1296** commercial emails were

24   sent to did not solicit the emails.  These emails were unsolicited because they were sent to

25   unassigned or inactive email accounts owned by **ASIS**.  **ASIS** did not solicit any product,

26   service, or information from any entity using these email accounts.

27       10.    Plaintiff alleges that Defendants sent or caused to have sent **1296** unsolicited e-

28   mail advertisements containing and/or accompanied by falsified, misrepresented, or forged

header information.

11.     Plaintiff alleges that Defendants used a harvest and directory attack to acquire Plaintiff's and Plaintiff's customers email accounts to send **1296** commercial electronic mail messages to a Plaintiff's protected computer.  Many of the email accounts receiving the emails have not been in-active for several years.

### FIRST CAUSE OF ACTION
### (Violation of CAN-SPAM Act of 2003 – 15 *U.S.C.* §7704(a)(1) and (2), and 15 *U.S.C.* §7704(b)(1) and (3))

12.     Plaintiff refers to the allegations of the preceding paragraphs of this complaint, and incorporates the same herein by this reference as though set forth in full.

13.     On **October 25, 2005, through August 14, 2007**, Plaintiff received **1296** commercial electronic mail messages from defendants to its mail server located in California that violated the *CAN-SPAM Act of 2003*.

14.     Plaintiff alleges that all of the relevant electronic mails sent by or on behalf of the Defendants on **October 25, 2005, through August 14, 2007**, contained or were accompanied by header information that was materially false or materially misleading.  At the time each of these emails was sent the true identity of the senders was concealed using proxy or privacy services.  Each of these **1296** messages indicated that they were from email accounts such as: "Girls Gone Wild" GirlsGoneWild@weekendropedust.com (see email, landing page, email source and whois information in Exhibit "A" attached hereto); "eliza grimes" elizagrimes@sourtreasury.com (see email, landing page, email source and whois information in Exhibit "B" attached hereto); "PaidSurveys" PaidSurveys@orangescreens.com (see email, email source, whois information, and the gif image in the email printed directly from the Azoogle server 1100i.com in Exhibit "C" attached hereto); "carrythedeal" carrythedeal@manytimesforyou.com (see email, email source, whois information for manytimesforyou.com, the landing page directinsureonline.com, and the WHOIS information for directinsuronline.com in Exhibit "D" attached hereto); and various other unknown identities. Note that all receiving email accounts have been redacted, while these email all represent inactive email accounts they are still the property of **ASIS Internet Services** and are protected

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF     4

1    by ASIS's corporate privilege.  A WHOIS check of the domain name registration for

2    weekendropedust.com, sourtreasury.com, and manytimesforyou.com indicate that their

3    domain names were registered under a protection service (WHOIS Privacy Protection Service,

4    Inc.).  A WHOIS check of the domain name registration for orangescreens.com indicates that

5    the domain name was registered under a proxy service (Domains by Proxy, Inc.).  The true

6    registrant for these domains cannot be determined without a subpoena.  See Exhibit "B" for

7    the email, source code, and WHOIS report attached hereto.  Plaintiff has reviewed the Domain

8    Name registration for all of the sending Domain Names and determined that at the time of

9    sending all of the emails were sent using email accounts registered to domain names that

10    were registered under services that conceal the true identity of the domain name registrant

11    through a proxy service or privacy service.  See the WHOIS reports for all sending domain

12    names in Exhibit "E."  Also see examples of domain name privacy/proxy service

13    advertisements/policies in Exhibit "F."  Note that Registerfly.com, owner of Protectfly.com, lost

14    its accreditation as a registrar from ICANN and is no longer in business.  **15 *U.S.C.***

15    **§7704(a)(1)(A)** states:

16          "(A) header information that is technically accurate but includes an
             originating electronic mail address, domain name, or Internet
17          Protocol address the access to which for purposes of initiating the
             message was obtained by means of false or fraudulent pretenses
18          or representations shall be considered materially misleading.

19      **15 *U.S.C.* §7704(a)(6)** states:

20          "the term "materially", when used with respect to false or
             misleading header information, includes the alteration or
21          concealment of header information in a manner that would impair
             the ability of an Internet access service processing the message on
22          behalf of a recipient, a person alleging a violation of this section, or
             a law enforcement agency to identify, locate, or respond to a
23          person who initiated the electronic mail message or to investigate
             the alleged violation…"
24

25    Therefore, since false information was used to generate the domain names and/or domain

26    names were concealed from investigation through proxy/privacy services the electronic mail

27    messages violated **15 *U.S.C.* §7704(a)(1)(A)**.

28      15.  Plaintiff further alleges that it received thousands of separate items of electronic

1    mail from the Defendants to email addresses that had not existed for the prior year and had

2    not requested or agreed to accept any solicitations.

3        16.    Plaintiff further alleges that the email advertisements were sent on behalf of

4    Defendants.  Many of the emails contained Uniform Resource Locators (hereafter "URL") that

5    directed the recipient or were sent to sites that redirected the recipient to websites owned by

6    Defendant Azoogle.  For example the email from "eliza grimes" elizagrimes@sourtreasury.com

7    sends the recipient to "azoogleads.com/error.html," the site that used by Azoogle when an

8    advertising  campaign  is  discontinued.  See  Exhibit B.    The  email  from  "carrythedeal"

9    carrythedeal@manytimesforyou.com        sends       the      recipient      to      the      web      site

10   Directinsureonline.com that is owned by Azoogle.  See Exhibit D.  The email from "Girls Gone

11   Wild"      GirlsGoneWild@weekendropedust.com        sends       the      recipient      to      the      URL:

12   http://www.girlsgonewild.com/index.cfm?action=home.sitecontentfile&f=landingpages/ultimater

13   ush2b_999_0sh&pccode=ultimaterush_adzoogle&nats=MjE3OjI4Ojk0,0,0,0,0&ptoken=azg_10

14   366-061007CAPITALAZGGW&bp=1.  See Exhibit A.  This URL is obviously a redirect through

15   Azoogle to the final landing page.  Many of the links are no longer operating and therefore the

16   final landing page cannot be determined.  **All** of the emails contain URLs to images located on

17   one of the following Azoogle servers:  "qckjmp.com," "stopmailinglist.com," "azjmp.com," and

18   "1100I.com."  See source code contained in Exhibits "A", "B", "C" and "D" and WHOIS reports

19   in Exhibit "G."   These images are downloaded from the Azoogle servers when the emails are

20   opened by a recipient.

21       17.    Plaintiff further alleges that the Defendants sent or had sent **1296** separate items

22   of electronic mail to Plaintiff's computer that were acquired as the result of a directory harvest.

23   Said conduct was in violation of **15 *U.S.C.* §7704(b)(1)**.

24       18.    As a proximate result of said unlawful conduct by said Defendants, Plaintiff is

25   entitled to statutory damages in the amount of up to $100.00 per email in the case of violation

26   of  **15  *U.S.C.*  §7704(a)(1)**  in  the  form  of  statutory  damages  as  set  forth  in  **15  *U.S.C.***

27   **§7706(g)(1)(B)(ii) and (3)(A)(i) and (ii)**.

28       19.    As a proximate result of said unlawful conduct by said defendants, Plaintiff is

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    6

1  entitled to treble all statutory damages as a result of violation of any section of **15** *U.S.C.*
2  **§7704(b)** as set forth in **15** *U.S.C.* **§7706(g)(1)(C)**.

3      20.    Plaintiff furthermore seeks a preliminary and permanent injunction against the
4  defendants for their current and future violations of the ***CAN-SPAM Act of 2003*** as Plaintiff
5  and members of the general public will continue to incur damages as a result of the unlawful
6  conduct of said defendants.   The seeking of injunctive relief by the plaintiff is specifically
7  authorized by **15** *U.S.C.* **§7706(g)(1)(A)**.

8      21.    Plaintiff furthermore seeks its attorney fees and costs against the defendants
9  pursuant to **15** *U.S.C.* **§7706(g)(4)**.

10                          **SECOND CAUSE OF ACTION**
11          **(Violation of *California Business and Professions Code* §17529.5**
            **Unlawful activities relating to commercial email advertisements.)**

12     22.    Plaintiff hereby incorporates by reference paragraphs 1 through 21, inclusive, as
13  if the same were fully set forth herein.

14     23.    Plaintiff alleges that all of the relevant electronic mail advertisements sent or sent
15  on behalf of the Defendants on **October 25, 2005, through August 14, 2007,** accompanied
16  by header information that was materially false or materially misleading.  Each of these **1296**
17  messages indicated that they were from email accounts such as: "Girls Gone Wild"
18  GirlsGoneWild@weekendropedust.com (see email, landing page, email source and whois
19  information in Exhibit "A" attached hereto); "eliza grimes" elizagrimes@sourtreasury.com (see
20  email, landing page, email source and whois information in Exhibit "B" attached hereto);
21  "PaidSurveys" PaidSurveys@orangescreens.com (see email, email source, whois information,
22  and the gif image in the email printed directly from the Azoogle server 1100i.com in Exhibit "C"
23  attached hereto); "carrythedeal" carrythedeal@manytimesforyou.com (see email, email
24  source, whois information for manytimesforyou.com, the landing page directinsureonline.com,
25  and the WHOIS information for directinsuronline.com in Exhibit "C" attached hereto);  and
26  various other unknown identities.   Note that all receiving email accounts have been redacted,
27  while these email all represent inactive email accounts they are still the property of **ASIS**
28  **Internet Services** and are protected by ASIS's corporate privilege.  A WHOIS check of the

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    7

1   domain   name   registration   for   weekendropedust.com,   sourtreasury.com,   and

2   manytimesforyou.com indicate that their domain names were registered under a protection

3   service (WHOIS Privacy Protection Service, Inc.).   A WHOIS check of the domain name

4   registration for orangescreens.com indicates that the domain name was registered under a

5   proxy service (Domains by Proxy, Inc.).   The true registrant for these domains cannot be

6   determined without a subpoena.   See Exhibit "B" for the email, source code, and WHOIS

7   report attached hereto.   Plaintiff has reviewed the Domain Name registration for all of the

8   sending Domain Names and determined that all of the emails were sent using email accounts

9   registered to domain names that are registered under services that conceal the true identity of

10   the domain name registrant through a proxy service or privacy service.   See the WHOIS

11   reports for all sending domain names in Exhibit "E."   Also see examples of domain name

12   privacy/proxy service advertisements/policies in Exhibit "F."   Note that Registerfly.com, owner

13   of Protectfly.com, lost its accreditation as a registrar from ICANN and is no longer in business.

14   *California Business and Professions Code* § 17529.5(a)(2).

15      24.    Plaintiff further alleges that the email advertisements were sent on behalf of

16   Defendants.   Many of the emails contained Uniform Resource Locators (hereafter "URL") that

17   directed the recipient or were sent to sites that redirected the recipient to websites owned by

18   Defendant **Azoogle**.        For      example      the      email      from      "eliza      grimes"

19   elizagrimes@sourtreasury.com sends the recipient to "azoogleads.com/error.html," the site

20   that used by Azoogle when an advertising campaign is discontinued. See Exhibit B.   The email

21   from "carrythedeal" carrythedeal@manytimesforyou.com sends the recipient to the web site

22   Directinsureonline.com that is owned by Azoogle.   See Exhibit D.   The email from "Girls Gone

23   Wild"    GirlsGoneWild@weekendropedust.com    sends    the    recipient    to    the    URL:

24   http://www.girlsgonewild.com/index.cfm?action=home.sitecontentfile&f=landingpages/ultimater

25   ush2b_999_0sh&pccode=ultimaterush_adzoogle&nats=MjE3OjI4Ojk0,0,0,0,0&ptoken=azg_10

26   366-061007CAPITALAZGGW&bp=1.   See Exhibit A.   This URL is obviously a redirect through

27   Azoogle to the final landing page.     Many of the links are no longer operating and therefore

28   the final landing page cannot be determined.   **All** of the emails contain URLs to images located

on one of the following Azoogle servers:  "qckjmp.com," "stopmailinglist.com," "azjmp.com," and "1100l.com."  See source codes contained in Exhibits "A", "B", "C" and "D" and WHOIS reports in Exhibit "G."  These images are downloaded from the Azoogle servers when the emails are opened by a recipient.

25.    As a proximate result of said unlawful conduct by said Defendants, Plaintiff is entitled to liquidated damages in the amount of $1,000.00 for each unsolicited commercial email transmitted in violation of *California Business and Professions Code* § 17529.5(a) as set forth in *California Business and Professions Code* § 17529.5(b)(1)(B)(ii).

26.    Plaintiff furthermore seeks its attorney fees and costs against the defendants pursuant to *California Business and Professions Code* §17529.5(b)(1)(C).

WHEREFORE, plaintiff prays judgment against the defendants and each of them as follows:

1.    For statutory damages of up to $100.00 for each violation of **15 *U.S.C.* §7704(a)(1)** in the sum of **$129,600**;

2.    For aggravated damages under **15 *U.S.C.* §7706(g)(1)(C)** of up to three times the amount above for these violations committed by the defendants' violations of **15 *U.S.C.* §7704(b)** in the sum of **$388,800**;

3.    For a preliminary and permanent injunction preventing the defendants and all persons acting in concert with them from the violation of the ***Can-Spam Act of 2003***;

4.    For liquidated damages of $1,000.00 for each violation of ***California Business and Professions Code*** § 17529.5(a) in the sum of **$1,296,000**;

5.    For an award of reasonable attorneys' fees and costs according to proof;

6.    For costs of suit; and

7.    For such other and further relief as this Courts deems just and proper.

SINGLETON LAW GROUP

Dated:    August 24, 2007

Jason K. Singleton
Richard E. Grabowski,
Attorneys for Plaintiff, **ASIS INTERNET SERVICES**

## REQUEST FOR JURY TRIAL

Plaintiff hereby requests a jury for all claims for which a jury is permitted.

SINGLETON LAW GROUP

Dated:        August 24, 2007

Jason K. Singleton
Richard E. Grabowski
Attorneys for Plaintiff, **ASIS INTERNET SERVICES**