**Jason K. Singleton,** State Bar #166170
jason@singletonlawgroup.com
**Richard E. Grabowski,** State Bar #236207
rgrabowski@mckinleyville.net
**SINGLETON LAW GROUP**
611 "L" Street, Suite A
Eureka, CA 95501

(707) 441-1177
FAX 441-1533

Attorneys for Plaintiff, ASIS INTERNET SERVICES

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIS INTERNET SERVICES, a California corporation,<br><br>　　　Plaintiff,<br>vs.<br><br>AZOOGLE.COM, INC., a Delaware Corporation dba AZOOGLEADS US, INC., a Delaware Corporation, and DOES ONE through FIFTY, inclusive,<br><br>　　　Defendants. | Case No. C-07-4630 JCS<br><br>**OPPOSITION TO DEFENDANT'S MOTION FOR SECURITY BOND**<br><br>DATE: To be Determined<br>TIME: 1:30 p.m.<br>CTRM: A, 15th Floor |

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................1

II. BACKGROUND ..................................................................................................1

III. DISCUSSION ......................................................................................................1

    1.  **Plaintiff's financial condition.** ..................................................................2

    2.  **Defendant's allegation of abusive discovery is without merit** ...............3

    3.  **The Issue of Standing**................................................................................3

    4.  **Merits of the within suit.** .........................................................................9

    5.  **Regarding aspersions by Defendant on Plaintiff's motives**.................10

## TABLE OF AUTHORITIES

**Cases**

*ASIS Internet Services v. Optin Global, Inc.*, Slip Copy, 2008 WL 1902217 at 24 (N.D.Cal.,2008) .................................................................................................. passim
*ASIS v Optin Global* (Northern District of California, C 05-5124 ............................................ 1
*Branson v Nott*, 62 F.3d 287, 292 (9th Cir 1995) ........................................................................ 2
*California Business & Professions Code* §17529.5 ................................................................... 4
*Ex parte McCardle*, 74 U.S. 506 at 514 (U.S., 1868) ................................................................. 4
*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ......................................................................... 11
*Gordon v. Virtumundo, Inc.*, 2007 WL 1459395 (W.D. Wash. May 15, 2007) ......................... 7
*Hypertouch, Inc. v. Kennedy-Western University*, 2006 WL 648688 at 4 (N.D.Cal.,2006) ... 7
*In re Knight*, 207 F3d 1115, 1117 (9th Cir.2000) ....................................................................... 2
*Lee v. City of Los Angeles*, 250 F.3d 668 at 690 (9th Cir., 2001) ......................................... 4, 5
*Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (1986) .................................................. 11
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 561 (1992) .................................................. 3, 9
*Molski v Levon Investments LLC,* 231 Fed. Appx. 685 (2007 WL 1426608) .......................... 2
*Simulnet East Associates v. Ramada Hotel Operating Co.*, 37 F.3d 573, 576 (9th Cir. 1994) .................................................................................................................. 1
*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 at 94 (U.S., 1998) .................... 4
*U.S. v. Contra Costa County Water Dist.*, 678 F.2d 90 at 92 (9th Cir., 1982) ....................... 2
*Warth v. Seldin*, 422 U.S. 490 at 500 (1975) ............................................................................. 9
*Whitmore v. Arkansas*, 495 U.S. 149 at 154 – 155 (U.S., 1990) .............................................. 4

**Statutes**

15 *USC* 7701(6) ....................................................................................................................... 5, 6
15 *USC* 7704(a) ........................................................................................................................... 4
15 *USC* 7704(a)(6) ...................................................................................................................... 9
15 *USC* 7704(b) ........................................................................................................................... 4
15 *USC* 7706(g) ........................................................................................................................... 5
15 *USC* 7706(g)(1) ................................................................................................................. 5, 10
15 *USC* 7706(g)(3)(A) ................................................................................................................. 6
*California Business and Professions Code* §17529.5 ..................................................... passim
*CAN SPAM Act* ................................................................................................................. passim

**Other Authorities**

FTC Report: *Effectiveness and Enforcement of the CAN SPAM Act, a Report to Congress*, December 2005 at ii ............................................................................................ 10
FTC Staff Report: *Spam Summit: The Next Generation of Threats and Solutions*, November 2007, P A-1 ............................................................................................................ 8
*Ironport Systems, Inc.: INTERNET SECURITY TRENDS FOR 2007, A REPORT ON SPAM, VIRUSES AND SPYWARE*, by Tom Gillis, 2007 P 3 ........................................... 8
S. REP. NO. 108-102, at 22 (2003) (Comm. Rep. on *CAN-SPAM Act of 2003* (S.877)) ..... 6, 7

**Rules**

*FRE* Rule 408 .............................................................................................................................. 2

## I. INTRODUCTION

Plaintiff, **ASIS INTERNET SERVICES (hereafter ASIS)**, responds to Defendant, **AZOOGLE.COM, INC., a Delaware Corporation dba AZOOGLEADS US, INC., a Delaware Corporation, (hereafter Azoogle)** Motion for Security Bond.

Plaintiff objects to Defendant's motion as Defendant failed to meet and confer prior to filing the within motion in violation of Local Rule 54-6.

## II. BACKGROUND

Plaintiff is a provider of internet access and email services to consumers. Defendant is an internet marketing firm that uses bulk commercial email to market products. Defendant, or Defendant's affiliates, sent some **1296** spam email messages to Plaintiff's email servers. These emails violate the **CAN SPAM Act** and **California Business and Professions Code** §17529.5.

The evidence to support Plaintiff's allegations is very strong, much of which is attached to the Complaint as Exhibits.

## III. DISCUSSION

"In requiring a security bond for defendants' costs, care must be taken not to deprive a plaintiff of access to the federal courts. To do so has serious constitutional implications. Our statutes and case law make it evident that we studiously avoid limitation of access to the courts because of a party's impecunious circumstance." "In order to avoid depriving a plaintiff of access to the courts by a security bond requirement, the courts in some cases must strike a delicate balance...' 'toll-booths cannot be placed across the courthouse doors in a haphazard fashion. The district court, in the exercise of its sound discretion, must settle upon an assurance which is fair in the light not only of the case itself and of the exigencies faced by the defendant, but also fair when illuminated by the actual financial situation of the plaintiff." **Simulnet East Associates v. Ramada Hotel Operating Co.**, 37 F.3d 573, 576 (9th Cir. 1994)

In **ASIS v Optin Global** (Northern District of California, C 05-5124, Docket #72), Judge Wilkin denied Defendant's request for a security bond, stating: "*Moreover, this is a new area of law in which the scope of liability is not clear; requiring Plaintiff to post a security bond at this*

1  *juncture could chill private enforcement of anti-spam laws.*" Courtesy copy attached hereto.

2  **1.     Plaintiff's financial condition.**

Plaintiff is not "on the brink of bankruptcy." Plaintiff **ASIS** Internet Services has approximately 1000 internet customers and gross yearly revenues in the hundreds of thousands of dollars. In part because of the costs of spam filtering, the purchase of bandwidth, and server capacity sufficient to deal with several hundred thousand spam emails per day, and the consumption of many hours of customer service employees time dealing with spam, ASIS yearly profit is pedestrian. It's a living, and not much more.

Defendant's statement that Plaintiff's counsel represented **ASIS** would file bankruptcy is inaccurate. In any event, such conversations were during settlement discussions, and are therefore inadmissible.   **FRE Rule** 408; ***U.S. v. Contra Costa County Water Dist.***, 678 F.2d 90 at 92 (9th Cir., 1982);   Declaration of Jason K. Singleton, ¶2.

Plaintiff is not financially able to post a $200,000.00 cost bond. If that is required, Plaintiff will be denied access to the Court.

Defendant posits the within suit will be dismissed on the grounds Plaintiff lacks standing following Judge Spero's interpretation of "adverse effect" under the **CAN SPAM Act**. A thorough discussion of that issue is set forth below. Even supposing, for the sake of argument, that Defendant is correct, then Defendant will not incur any significant recoverable costs. Defendant's motion to dismiss will be heard before discovery commences, and before any out of pocket costs are incurred. If the Defendant's motion to dismiss is granted on the basis of a lack of standing, then Defendant cannot recover attorney fees. ***Molski v Levon Investments LLC,*** 231 Fed. Appx. 685 (2007 WL 1426608) (courtesy copy attached), ***Branson v Nott***, 62 F.3d 287, 292 (9th Cir 1995), ***In re Knight***, 207 F3d 1115, 1117 (9th Cir.2000)  Consequently, even supposing Defendant is correct that Plaintiff lacks standing, the only recoverable costs post a motion to dismiss will be the filing fee and duplication costs. Therefore a bond request of $200,000 is without merit.

///

///

### 2. Defendant's allegation of abusive discovery is without merit.

The *ASIS v OPTIN GLOBAL* matter was very complicated legally and factually. Judge Spero noted this himself in the summary judgment order. *ASIS Internet Services v. Optin Global, Inc.*, Slip Copy, 2008 WL 1902217 at 24 (N.D.Cal.,2008) (courtesy copy attached). There was, in fact, extensive discovery on both sides, and it was necessary. Defendant Azoogle, has many thousands of affiliates, who themselves have sub affiliates. There was over ten thousand spam emails at issue, which were sent from a thousand different IP addresses.

The present matter differs significantly from the previous Azoogle matter. This case deals with different transactions, different defendants, and occurred in a different time frame. In the present matter, it is clear that Defendant has advertised its web sites, products and services within the body of the subject spam emails at issue in this litigation. See Complaint Para. 19 and Exhibits A, B, C, D, and G. There is no problem in identifying who is the advertiser, Defendant Azoogle, in the subject emails. This was an issue of serious contention in *ASIS Internet Services v. Optin Global, Inc.* It is also clear that the emails contain false headers as they were all sent from email accounts with domain names registered using proxy/privacy services. This makes the header information false and misleading by definition. See Complaint Para. 14 and Exhibits A, B, C D, E and F. This was also an issue in the prior case.

All cases require discovery. That fact simply does not mitigate in favor of imposing a cost bond. While some discovery will be necessary in this case it is likely limited to discovering the contractual details surrounding Azoogle's affiliates as relates to the subject emails.

It is also likely that summary judgment against Defendant on the second cause of action for violation of the *California Business and Professions Code* §17529.5 can proceed with minimal discovery.

### 3. The Issue of Standing.

Defendant's arguments concerning Standing are meritless at this point. Prior to summary judgment, Standing is determined based on the factual allegations of the pleadings.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 561 (1992).

The **CAN SPAM Act** provides standing for an Internet Access Provider (hereafter "IAP") adversely affected by various violations of 15 **USC** 7704(a). Plaintiff ASIS provides Internet access service within the meaning of 15 **USC** §7702(11) and email service within the meaning of **California Business & Professions Code** §17529.5. See Complaint ¶ 1 and the general averments of harm within the Complaint. Plaintiff has alleged violations of 15 **USC** 7704(a) and (b), and **California Business and Professions Code** §17529.5.

Therefore Plaintiff has met the requirements for standing at the pleading stage.

The Court may of course take judicial notice of the District Court's opinion in ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 (N.D.Cal., 2008). However, the Court can only take notice of the existence of the opinion, "not for the truth of the facts recited therein, but for the existence of the opinion…" ***Lee v. City of Los Angeles***, 250 F.3d 668 at 690 (9th Cir., 2001). More important, the Court cannot take judicial notice of the subsequent holdings in the ***ASIS Internet Services v. Optin Global, Inc.*** regarding procurement or the **California Business & Professions Code** §17529.5, as the court lacked jurisdictions to make further rulings once it had ruled Plaintiff lacked standing to bring an action under the **CAN SPAM Act** of 2003.

> "[T]he person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue … the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." ***Whitmore v. Arkansas***, 495 U.S. 149 at 154 – 155 (U.S., 1990).

> "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." ***Steel Co. v. Citizens for a Better Environment***, 523 U.S. 83 at 94 (U.S., 1998); quoting ***Ex parte McCardle***, 74 U.S. 506 at 514 (U.S., 1868).

Defendant's attorneys would have the present case before the Court decided on the basis of ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 (N.D.Cal.,2008): "Judge Spero's decision likely precludes ASIS from even bringing this case." Defendant's Memorandum (Docket 8) P 2 L 12. This would of course be an improper ruling.

*Lee v. City of Los Angeles*, 250 F.3d 668 at 690 (9th Cir., 2001). As the *Lee* case established a court cannot assume the truth of the facts presented based on a prior decision, and must "draw all reasonable inferences from plaintiffs' allegations". *Lee v. City of Los Angeles*, 250 F.3d 668 at 690 (9th Cir., 2001).

The case before the Court has different facts, is based on different transactions, and occurred in a different time frame. Therefore, Defendant's arguments from the prior case regarding Plaintiff's Standing are not relevant to the motion before the Court.

In addition, Judge Spero's decision was based on a narrow interpretation of the law and the facts regarding adverse affect. Plaintiff **ASIS** disputes that interpretation and the dispute is before the 9th Circuit Court of Appeals.

The court in ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 (N.D.Cal., 2008) held that Plaintiff, **ASIS**, did not have standing as an Internet Access Provider under 15 *USC* 7706(g) because **ASIS** had not demonstrated adverse affect at summary judgment. To reach this conclusion the District Court created a definition of adverse affect that includes *significant harm peculiar to an IAP specifically caused by the subject emails*. The District Court's definition of adverse affect is not supported by the language of the statute or the legislative history.

Congress has identified the class of persons who have standing to bring actions under 15 *USC* 7706(g) as providers of Internet access services. 15 *USC* 7706(g)(1). It is an undisputed fact that ASIS Internet Services is a provider of Internet access services.

15 *USC* 7706(g)(1) defines the requisite injury for standing as "adversely affected." Congress defined the type of harm that the ***CAN SPAM Act*** was intended to vindicate:

> (6) The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and institutions can handle without further investment in infrastructure. 15 *USC* 7701(6).

The legislature further expanded on this definition in the penalties section:

> For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number

>of violations (with each separately addressed unlawful message that is transmitted or **_attempted to be transmitted_** over the facilities of the provider of Internet access service… 15 **USC** 7706(g)(3)(A). (emphasis added)

The text of the **CAN SPAM Act** clearly points to the harm, relating to IAPs, that the Act is attempting to redress as the cost of carrying SPAM emails over the IAP's facilities. The **ASIS v Optin Global** Court did not agree with this definition of harm and created a new definition that in effect makes it impossible for any IAP to bring an action under the **CAN SPAM Act**[1].

The **ASIS v Optin Global** Court relied heavily on the legislative history. However, even though the District Court cites the Senate Report text, it did not give credence to the clear language concerning enforcement of the act in **S. REP. NO. 108-102**, at 22 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877))(a courtesy copy attached):

>Section 7(f) would allow a provider of Internet access service adversely affected by a violation of section 5 to bring a civil action in Federal district court or other court of competent jurisdiction. <u>This could include a service provider who carried unlawful spam over its facilities</u>, or who operated a website or online service from which recipient e-mail addresses were harvested in connection with a violation of section 5(b)(1)(A)(i). (Emphasis added).

This text from the legislative record clearly indicates that the type of harm contemplated for enforcement is "carrying the unlawful spam over" the IAP's facilities. This correlates exactly with the language in the statute at 15 **USC** 7706(g)(3)(A) and 15 **USC** 7701(6). This portion of the legislative history appears in the section labeled "Section 7. Enforcement by the Federal Trade Commission". Even though labeled under the FTC this section also includes enforcement by State Attorney Generals and IAPs. See **S. REP. NO. 108-102**, at 22 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)).

This definition takes into account the ongoing harm that every legitimate IAP incurs on a daily basis. IAPs incur ongoing costs for filtering, network bandwidth, processing, storage, and

---

[1] Virtually every IAP purchases spam filtering. If the IAP let hundreds of thousands or millions of spam each day get through to their clients, they would be out of business within days. Hence, if an IAP is going to file suit over spam sent to its servers, that spam must be collected either before it hits the spam filter, or after. In either event, the IAP will have a very difficult time showing the discreet, individualized economic loss from the subject emails required by Judge Spero. If it is collected before, defendants will say plaintiff turned off their spam filter. If after, they will say there was no discreet loss since the spam was blocked by the filter.

customer service.

The **ASIS v Optin Global** Court relied heavily on **Gordon v. Virtumundo, Inc.**, 2007 WL 1459395 (W.D. Wash. May 15, 2007) (courtesy copy attached) in its decision. The **ASIS v Optin Global** Court and the **Gordon** Court also cite **Hypertouch, Inc. v. Kennedy-Western University**, 2006 WL 648688 at 4 (N.D.Cal.,2006) (courtesy copy attached) citing the text "Hypertouch has submitted a declaration indicating that high spam loads have caused decreased server response and crashes, led to higher bandwidth utilization, and forced expensive hardware and software upgrades." **ASIS Internet Services v. Optin Global, Inc.**, Slip Copy, 2008 WL 1902217 at 25 (N.D.Cal.,2008); **Gordon v. Virtumundo, Inc.**, 2007 WL 1459395 at 5 (W.D. Wash. May 15, 2007).

The District Court defined "adversely affected" as "a particular type of harm and that harm is 'significant'." Relying on **Hypertouch, Inc. v. Kennedy-Western University**, 2006 WL 648688 (N.D. Cal. March 8, 2006), **Gordon v. Virtumundo, Inc.**, 2007 WL 1459395 (W.D. Wash. May 15, 2007); and portion of the legislative record at **S. REP. NO. 108-102**, at 6 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)).

As both the **ASIS v Optin Global** Court and the **GORDON** Court noted, the Congress described the harm caused by SPAM as:

> "[s]pam imposes significant economic burdens on ISPs, consumers and businesses" because "[m]assive volumes of spam can clog a computer network, slowing Internet service for those who share that network. ISPs must respond to rising volumes of spam by investing in new equipment to increase capacity and customer service personnel to deal with increased subscriber complaints." Order P. 25 L 23 – 26; **Gordon v. Virtumundo, Inc.**, 2007 WL 1459395 at 6 (W.D. Wash. May 15, 2007); citing **S. REP. NO. 108-102**, at 6 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)) (courtesy copy attached)

This section of text appears under the title "Costs to ISPs, Consumers, and Businesses." **S. REP. NO. 108-102**, at 6 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)). It does not appear in the section of the report labeled "Section 7. Enforcement by the Federal Trade Commission" ibid. at 22.

Considering this language, the ongoing costs of filtering and prosecuting spammers also

1  represent adverse affect.

2  These citations to the Senate report also represent the state of technology and
3  investment by IAPs in 2003.  They do not represent the environment today.

4  The Federal Trade Commission reports that SPAM filters used by ISPs effectively block
5  the vast majority of SPAM sent to harvested email accounts.  **FTC Staff Report**: *Spam*
6  *Summit: The Next Generation of Threats and Solutions*, November 2007, P A-1 (courtesy copy
7  attached).  Because IAPs have improved their networks, increased bandwidth and server
8  capacity, and installed SPAM filtering processes they no longer experience server crashes
9  based on spam attacks. *Id.*

10  The amount of SPAM has not decreased, it has increased at astronomical rates.
11  Ironport Systems Inc., an Internet security firm, reports that in 2005 SPAM volumes increased
12  by 200%.  Ironport further reports that SPAM volumes more than tripled in 2006 and the trend
13  indicated SPAM volumes would more than double in 2007.  This required a 300 percent
14  increase in email gateway capacity in 2006 over 2005.  *Ironport Systems, Inc.: INTERNET*
15  *SECURITY TRENDS FOR 2007, A REPORT ON SPAM, VIRUSES AND SPYWARE*, by Tom
16  Gillis, 2007 P 3 (courtesy copy attached)..

17  Under the ***ASIS v Optin Global*** Court's definition of "adverse affect" it is very unlikely
18  that any provider of Internet access services will ever have standing to bring a suit under the
19  ***CAN SPAM Act***.  IAPs, including **ASIS**, have put into place filtering systems, better networks,
20  more processing capacity and staff to handle complaints.  Servers and networks no longer
21  crash.  Customers do not see the great majority of SPAM.  Even so, IAPs must continue to
22  spend resources, at a growing rate, in order to stop the increasing onslaught of SPAM.  This is
23  exactly what the legislature predicted and exactly what they intended to prevent by the ***CAN***
24  ***SPAM Act of 2003***.

25  Further it is likely that even this level of harm is not necessary as **Article III** standing
26  can be created by Congress creating a right and the invasion of that right.  The Court in ***Lujan***
27  stated: "Nothing in this contradicts the principle that '[t]he ... injury required by Art. III may exist
28  solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' ' "

1  *Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 578 (1992); citing *Warth v. Seldin*, 422 U.S. 490 at 500 (1975).  As examples the Court cited:  "individual's personal interest in living in a racially integrated community,… and injury to a company's interest in marketing its product free from competition."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 578 (1992).  Clearly the Congress intended to create a legal right for IAPs not to be spammed and empowered IAPs to enforce that right.  Invasion of that right therefore creates standing.  In this case Congress not only intended to create a legal right it intended to make that right a deterrent to the sending of SPAM.

If the Court finds that the significant harm definition of adverse affect is correct, then the intent of the legislature to protect the IAPs will have been thwarted.

**4.     Merits of the within suit.**

The case against Azoogle is very strong.  This is not a frivolous suit based on the evidence provided in the Complaint.

The emails contain advertisements linked through or to Azoogle's web sites.  The emails all contain false header information.  The emails all contain links that re-direct to Azoogle's web sites.  The only outstanding information required is evidence of whether Azoogle knew or consciously avoided knowing their affiliates would violate the ***CAN SPAM Act***.    Little or no evidence is required for the second cause of action for violation of ***California Business and Professions Code*** §17529.5.

All of these emails have false header information, in that they were sent using domain names that are registered through privacy/proxy services.  See Complaint ¶14.  This hides the identity of the sender from an Internet service provider or investigator making them materially false by definition.  15 ***USC*** 7704(a)(6).

Based on these assertions the primary issues for discovery by Plaintiff regard: 1) who was the actual sender of the emails, if it was not Azoogle; and 2) If Azoogle was not the sender, did they hire or induce the sending of the emails with knowledge or consciously avoiding knowing the sender would violate the ***CAN SPAM Act***.

Only very limited evidence is needed to move for a judgment on the second cause of

1  action for violations of **California Business and Professions Code** §17529.5.

2  **5.      Regarding aspersions by Defendant on Plaintiff's motives.**

Defendant's cast aspersions on Plaintiff **ASIS** as doing something improper by bringing **CAN SPAM Act** lawsuits against known SPAMMERS for emails received by ASIS' email servers. SPAM is illegal and Plaintiff is a valid business that has a right to protect itself against illegal attack.

Plaintiff receives over 200,000 spam emails every day. This attack is ongoing and increasing at a rapid rate. The fact that Plaintiff has brought multiple suits against multiple defendants is nothing more than an indication of the level of attack by these spammers.

Plaintiff did not go out looking for these SPAM emails. They were intentionally sent to Plaintiff's email servers in violation of the **CAN SPAM Act of 2003** and **California Business and Professions Code** §17529.5. It is impossible for the senders not to have intended that the illegal SPAM be sent to ASIS' servers, as each and every email contains a sent to address at "asis.com."

The **CAN SPAM Act of 2003** is a remedial statute that provides Standing specifically for Internet Access Providers, like ASIS, to protect itself by bringing suit in federal court. 15 **USC** 7706(g)(1). Plaintiff and many other IAPs have brought law suits to stem the tide of SPAM; including Microsoft, AOL, Earthlink, Verizon, and a variety of smaller IAPs. This has worked to effectuate the intent of the statute:

> Based on its own enforcement and policy work, and on the information gleaned from the extensive research conducted to prepare this Report, the Commission believes that the Act has been effective in achieving two desired outcomes. First, the substantive provisions of the Act have mandated adoption of a number of commercial email "best practices" that many legitimate online marketers are now following. Second, the Act has provided law enforcement agencies and ISPs with an additional tool to use when bringing suit against spammers.
>
> **FTC Report:** *Effectiveness and Enforcement of the CAN SPAM Act, a Report to Congress*, December 2005 at ii (courtesy copy attached).

Defendant's would now have the Court declare legitimate businesses who enforce

statutory rights as the criminals instead of the spammers.

Because this issue relates directly to the award of attorney fees and costs, the most instructive case is the Supreme Court decision of **Fogerty v. Fantasy, Inc.**, 510 U.S. 517 (1994). The Court adopted an "evenhanded approach" whereby the same standard is applied to both prevailing plaintiffs and prevailing defendants. "Prevailing plaintiffs and prevailing defendants are to be treated alike, but attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion. There is no precise rule or formula for making these determinations," *id.* at 534. The suggested factors to consider are: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at FN 19 (quoting **Lieb v. Topstone Industries, Inc.**, 788 F.2d 151, 156 (1986)). The Court emphasized that application of the factors must be "faithful to the purpose" of the statute. *Id.*

Plaintiff has demonstrated that this case is not frivolous. Plaintiff has demonstrated a proper purpose or motivation. Plaintiff has demonstrated that its case is not unreasonable from either a factual or legal standpoint. The imposition of a bond will in fact defeat the purpose of the **CAN SPAM Act**.

Defendant would now have the injured plaintiff put up bonds to be allowed to enforce their private right of action. If the Court agrees this will effectively end litigation by IAPs against spammers and thwart the intent of the legislature.

**SINGLETON LAW GROUP**

Dated:    May 27, 2008        /s/ Jason K. Singleton
Jason K. Singleton
Richard E. Grabowski, Attorneys for Plaintiff,
**ASIS INTERNET SERVICES**